The NEW YORK GUARDIAN MORTGA-
GEE CORP., Plaintiff,

v.

Max CLELAND, Administrator of the Veterans Administration, and the Government National Mortgage Association, Defendants.

No. 78 Civ. 3649.

United States District Court,
S. D. New York.

Jan. 8, 1979.

On Motion to Reargue April 3, 1979.

Milgrim, Thomajan & Jacobs, New York City, for plaintiff; George L. Graff, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., S. D. New York, New York City, for defendants; David M. Jones, Asst. U. S. Atty., Jane M. Edmisten, Asst. Gen. Counsel, Finance Dept. of Housing and Urban Development, Washington, D. C., Kathleen D. Koch, Atty. Advisor, Dept. of Housing and Urban Development, of counsel.

LASKER, District Judge.

The present case comes before the court on cross-motions for summary judgment. The New York Guardian Mortgagee Corp. ("plaintiff" or "Guardian") and the Government National Mortgage Association ("defendant" or "GNMA") seek a declaration of their rights and duties in connection with the distribution of certain funds to holders of "modified pass-through" securities issued by Guardian under GNMA's "Mortgage Backed Securities Program."[1]

1. In its initial complaint, Guardian also sought an injunction to prevent GNMA from taking any administrative or legal action against Guardian in connection with the present dis-

## I.

*The Statutory Scheme*

During 1968, Congress, in an effort to attract private capital into housing, created GNMA as a wholly-owned government corporation (12 U.S.C. § 1717(a)), and empowered it to implement what has come to be known as the "Mortgage Backed Securities Program" (12 U.S.C. § 1721(g)). In connection with this program, GNMA was authorized to issue securities "based on and backed by" a pool of mortgages guaranteed by one of several government agencies, including the Veterans Administration ("VA"), and to authorize qualifying private parties to issue such securities. *Id.* GNMA was further authorized to guarantee with the full faith and credit of the United States the timely payment of principal and interest falling due on such securities. *Id.*

The general purpose of these provisions was to foster a secondary market for home mortgages by providing a safety and liquidity not available to those investing directly in mortgages and to insulate GNMA investors from problems inherent in the management of mortgage portfolios. See 12 U.S.C. § 1716 (1976); S.Rep.No.1123 at 80 (90th Cong. 2d Sess.); H.Rep.No.1585, 2 U.S.Code Cong. & Admin.News, pp. 2873, 2944–45 (1968); Conf.Rep.No.1785, *Id.* at 3053, 3063; 114 Cong.Rec. 15,236 (1968) (Remarks of Sen. Bennett); *Id.* at 20,063.

Federal regulations establish two types of mortgage backed securities: "straight pass-through" securities, which provide for the payment by the issuer to the security holders of "principal and interest [generated by the underlying pool of mortgages] as *collected*" and "modified pass-through securities", which "provide for such payment, *whether or not collected,* of both specified principal installments and a fixed rate of interest on the unpaid principal balance, with all prepayments being passed through to the holder." 24 C.F.R. § 390.5 (1978) (emphasis added). The present lawsuit concerns modified pass-through securities. Both types of securities must specify, on an accompanying schedule, the dates by which payments are to be made to the holders. *Id.*

The mortgage backed securities program operates as follows. A financial institution or mortgage servicing company wishing to participate must assemble or acquire a pool of government insured or guaranteed mortgages. GNMA then enters into a standard form "Guaranty Agreement" with the issuer (this Guaranty Agreement is set forth at Appendix 19 to the GNMA Mortgage Backed Securities Guide, GNMA 5500.1 Rev. 4 (hereafter referred to as "GNMA Guide")), under which, *inter alia*, GNMA agrees to guarantee timely payments of principal and interest as required by the terms of the securities (Guaranty Agreement § 6.01), and the issuer agrees to remit in a timely manner all payments required by the terms of the securities. Guaranty Agreement § 4.01. Should the issuer fail to make timely payments as required, the security holder's sole recourse is against GNMA (*Id.* § 7.01). However, GNMA may treat the issuer's failure to make required payments as an event of default under the Guaranty Agreement (§ 8.01), and this provides GNMA with the option of extinguishing the issuer's interest in the pooled mortgages[2] and becoming owner of those mortgages "subject only to the unsatisfied rights of the holders of the securities . . . ." 12 U.S.C. § 1721(g) (1976); Guaranty Agreement § 8.05.

---

pute. Since GNMA, by stipulation dated August 11, 1978, has agreed to suspend any further action pending judicial resolution of this matter, Guardian has dropped its request for injunctive relief at this time. See Guardian's Brief at 3.

2. Under the Guaranty Agreement, the issuer is required to assign to GNMA "all the right, title and interest of the Issuer" in the pool mortgages. § 3.01. The mortgages are delivered to a designated custodian along with the original notes endorsed in blank and assignments to GNMA in "recordable form but not recorded." § 3.06. Since the assignments remain unrecorded, nominal title remains in the issuer. This assists the issuer in the performance of his duty to service the mortgages. § 3.04. The mechanics by which GNMA extinguishes the issuer's interest in the pooled mortgages are set forth at §§ 8.06–8.09 of the Guaranty Agreement.

## II.

*Facts*

The forces which ultimately led to the present lawsuit were set in motion between January 1, 1970 and June 30, 1972, during which time Eastern Service Corporation ("Eastern") assembled several pools of mortgages and entered into a series of Guaranty Agreements with GNMA, which entitled Eastern to issue securities backed by the mortgage pools and also to receive service fees for administering them. In return, Eastern assumed the obligations of an issuer of "modified pass-through" securities. Among the mortgages which comprised Eastern's pools, some were guaranteed by the Veterans Administration.

In late April, 1975, Eastern assigned its rights under the mortgages and the Guaranty Agreements to Regency Equities Corporation ("Regency"), a subsidiary of Guardian, the plaintiff here, and Regency assumed Eastern's obligations as issuer. The assignment was approved by GNMA on July 7, 1975, and VA was duly notified.

At the time of this assignment, some of the many mortgages in the eleven assigned pools were involved in state foreclosure proceedings which had been instituted by Eastern. However, subsequent claims on the VA guaranties underlying these mortgages were made by Regency, as assignee of Eastern's rights under the Guaranty Agreements. The VA responded to these claims in a letter dated August 18, 1975, in which it stated that claims on these guaranteed mortgage loans (hereinafter the "Eastern loans") would not be paid to Regency, since Regency was "not a true 'holder in due course' on date of assignment of the mortgages." After some inquiries, Regency received a second letter, dated May 5, 1976, which stated that the claims cited by Regency had been "offset against the amount due the Veterans Administration." Following certain proceedings not relevant here between Eastern and the United States Government,[3] Guardian, which by that time had become assignee of Regency's rights under the Guaranty Agreement,[4] renewed its efforts to obtain payment on the VA guaranties. The VA, in a letter dated July 11, 1978, stated that, since Eastern had been the holder of the mortgages at the time of their foreclosure, it was deemed by the VA to be the "only proper payee" on the Eastern loan guarantees. Any holder that accepted assignment of a mortgage following its foreclosure "did so at its own peril and would not be recognized as a holder in due course" by the VA. Furthermore, the VA noted that it had demanded reimbursement from Eastern for "losses incurred by the administrator as a result of claim payments made on certain loans originated by Eastern which were found to be tainted." When Eastern failed to respond to the VA's demands, the VA "offset"[5] the monies payable to Eastern on the guaranty claims now asserted by Guardian against

---

**3.** The facts surrounding Eastern's problems with the government are set forth in *United States v. Bernstein*, 533 F.2d 775 (2d Cir. 1976). A settlement agreement was reached between Eastern (and some of its principals) and the United States on March 23, 1978. This agreement, among other things, provided:

> "The United States agrees that it shall not . . . contest the validity (except as provided by law) of any Loan Guaranty Certificate . . . issued with respect to any home loan or mortgage originally made by Eastern where the . . . Loan Guaranty Certificate or Mortgage has been assigned to and is held, as of the date of this agreement, by an approved financial institution or mortgagee other than Eastern."

The VA has taken the position, in a letter to Guardian dated July 11, 1978, that this settlement has no bearing on the guaranties in question here.

**4.** Regency, a subsidiary of Guardian, assigned its rights and duties under the Guaranty Agreement to Guardian on June 28, 1976. This assignment was approved by GNMA on July 12, 1976.

**5.** Under 38 C.F.R. § 1.912 (1978), the VA is authorized to set off certain claims. It provides in pertinent part:

> "The Veterans Administration will initiate collection by offset on claims which are liquidated or certain in amount and where the right to offset exists. When previous demand has been made, offset action will be taken when the debtor either agrees to such action or fails to make satisfactory response to the first demand within 30 days."

the amounts which the VA claimed Eastern owed to it.

It should be noted that throughout this prolonged dispute between Guardian (and its predecessors in interest) and the VA, Guardian had advanced to security holders from its own funds scheduled payments of principal and interest arising from these foreclosed mortgages as they fell due. This was consistent with Guardian's view of its obligations with respect to defaulted mortgages as set forth in 24 C.F.R. § 390.5(a). However, GNMA, after being informed of the VA's disposition of Guardian's guaranty claim, notified Guardian in a letter dated July 18, 1978 that, because the Eastern loans had been "liquidated" and "because of the VA's determination that it will not make payments in connection with the loans", Guardian's duty as issuer of the securities was to pay to the security holders the full unpaid balance of the Eastern loans. Fulfillment of this duty, GNMA stated, was "essential to [Guardian's] continued participation and good standing in the GNMA Mortgage-Backed Securities Program."

### III.

*Discussion*

Although Guardian contests the VA's asserted "offset", its propriety is the subject of separate claims against the VA and is not at issue here.[6] What is at issue is whether, at this present juncture, Guardian is obliged to advance from its own funds a lump sum payment to security holders representing the unpaid balance remaining due on the loans.

Accordingly, Guardian seeks a declaration by this court that its obligation to make advances of *uncollected* payments to GNMA security holders is limited to the amounts set forth in the monthly payment schedules provided for under the terms of the securities. Guardian contends that it is only obliged to make *prepayments* (including

proceeds from recoveries on guaranties) when those prepayments are *actually received* by it, and not when, as here, the only "prepayment" made was an accounting offset for the benefit of a third party rather than an actual payment in hand.

### A. *GNMA's Claim*

GNMA maintains that regardless of the outcome of Guardian's pending action against the VA, Guardian has an immediate duty as issuer to advance from its own funds the unpaid balance of the Eastern loans. In the present case, GNMA claims, this duty was ripened by foreclosure of the mortgages coupled with VA's assertion that it had satisfied its guaranty obligation by set-off. While GNMA concedes that Guardian has a right to try to enforce its guaranties against the VA, it maintains this is purely a collection matter between an issuer and a guarantying agency and does not affect the duty of the issuer to make immediate payments to holders. This must be so in the present case, GNMA argues, since the mortgages in question are foreclosed and no longer in the pools. Unless the issuer advances the money from its own funds, GNMA claims, the outstanding securities will not be based on and backed by mortgages as required by § 1721(g).

In support of its argument, GNMA notes that, under the terms of the Guaranty Agreement (§ 4.01), an issuer is obliged to "remit to the holders [of securities], all payments to be made under the terms and conditions of all securities issued and outstanding under this Agreement . . .". The securities provide, in pertinent part:

"Each of the monthly installments shall be subject to adjustment to reflect any prepayments or other early or scheduled recoveries of principal, had from time to time, under or consistent with the provisions of the mortgages composing the pool. However, the issuer shall pay to the Holder, *whether or not collected by*

---

6. After GNMA's demand that Guardian advance the full unpaid balance of the loans in question, Guardian filed a complaint here containing two claims against the VA and two

against GNMA. The latter two claims are the subject of the present decision. The first two remain pending.

*the issuer,* and shall remit as set forth below, *monthly payments* of not less than the amounts of principal coming due monthly on the mortgages and apportioned to the Holder by reason of the aforesaid base and backing, *together with any apportioned prepayments or other early recoveries of principal and interest* at the fixed rate." (Emphasis added)

GNMA claims that the "whether or not collected" clause refers to both scheduled monthly payments and "prepayments" and that this language is dispositive. Guardian claims that "whether or not collected" refers only to scheduled payments and that "prepayments" need only be paid as received. We look to extrinsic materials as an aid to interpretation. Corbin, *Contracts* §§ 542A, 579. See generally Patterson, *The Interpretation and Construction of Contracts,* 64 Colum.L.Rev. 833 (1964).

The language in question closely parallels, but does not exactly track, language in 24 C.F.R. § 390.5(a), which distinguishes the "modified" from the "straight" pass-through security. That regulation states in pertinent part:

"Securities to be issued pursuant to the provisions of this subpart may . . . be . . . (1) Straight pass-through securities, which provide for the payment by the issuer to the holders of a proportionate share of the proceeds of principal and interest, as collected, on account of a pool of mortgages, less servicing fees and other specified costs . . . and (2) modified pass-through securities, which provide for *such payment, whether or not collected,* of both specified principal installments and a fixed rate of interest on the unpaid principal balance, *with all prepayments being passed through to the holder.*" (Emphasis added)

This passage suggests several things. First, "such payment" appears to refer back to "proportionate share of the proceeds of principal and interest" in the preceding clause defining "straight pass-through" securities. Secondly, the "whether or not collected" clause must certainly refer either to "such payments", which immediately precedes it, or "both specified principal installments and a fixed rate of interest" which immediately follows it (or perhaps to both, since they are equivalent). It does not appear to apply to the final clause ("with all prepayments being passed through to the holder"). Finally, the use of the words "passed through" in this last clause suggests that the regulation envisioned that "prepayments" would be received before they were paid. It is hard to imagine how something can be "passed through" until it is received.

Support for this reading can be found elsewhere. The standard form prospectus under which modified pass-through securities are sold describes the required payments as follows:

"Each of the monthly installments shall be subject to adjustment by reason of any prepayments or other early or unscheduled recoveries of principal on the pooled mortgages. In any event, the Issuer will pay to the holders monthly installments of not less than the interest due on the securities at the rate specified in the security, *together with any scheduled installments of principal whether or not collected* from the mortgagor *and any prepayments or early recovery or principal.*" (Emphasis added)

See GNMA Guide, Appendix 20 at 6. Similarly, GNMA, in describing the terms of securities to be issued in connection with mortgage backed serial notes, compares them with modified pass-through securities as follows:

"The terms of the securities shall be the same as modified pass-through securities in that payment of principal on the securities will be on the basis of scheduled principal *whether or not received* and principal prepayments *when received* and payment of interest on the outstanding amount of securities to commence 45 days after . . . issue." (Emphasis added)

See GNMA Guide, Chap. 14 at 14–1.

Finally, sections 4.02 and 4.03 of the Guaranty Agreement, when read together, also indicate the agreement contemplates

that "prepayments" are treated differently from scheduled payments. Section 4.02 states:

"The Issuer shall establish . . . controls . . . sufficient to enable the Issuer to accurately project the *inflow or recovery* of funds from the mortgages . . . and to relate . . . such projected *inflow or recovery* . . with *scheduled outflow or payments* required to be made under the terms and provisions of all securities . . .."

Section 4.03 states:

"In the event that any . . . comparison of projected inflow and outflow of funds as set forth in Section 4.02 above may indicate that the Issuer will not have available sufficient funds to meet any *scheduled outflow* in a timely manner, the Issuer either shall . . . make advances from its own funds sufficient . . . to meet *such outflow* or shall make timely application to GNMA requesting it to advance . . . funds . . . sufficient for such purpose . . provided that the advance of any funds by GNMA shall constitute an event of default [by the issuer] . . .." (Emphasis added)

It is clear from § 4.02 that the drafter of the Guaranty Agreement recognized a distinction between "scheduled outflow" and "payments". Yet when it came to defining the issuer's duty to advance money from its own funds in § 4.03, the drafter specifically limited that duty to *"scheduled outflow"* and specifically limited default under the agreement to a failure in that respect.

Further support for Guardian's interpretation of the language under which the securities here were issued is found in the regulations and Guaranty Agreement provisions dealing with an issuer's duties in the event of default on a pool mortgage. Section 390.5 of 24 Code of Federal Regulations states:

"In the case of delinquent mortgages in a pool backing modified pass-through securities, the issuer is required to make advances if necessary to maintain the specified schedule of interest and principal payments to the holders, *or at its option*, at any time 90 days or more after default of any such mortgage, the issuer may repurchase such mortgage." (Emphasis added)

This language indicating that repurchase of defaulted mortgages is merely an option is reiterated in § 4.15 of the Guaranty Agreement. Guardian argues with much force that under GNMA's view, this repurchase option is made mandatory. If the issuer has an immediate duty to advance the full unpaid balance to security holders, he has, in effect, repurchased the mortgage. Guardian argues that so long as an issuer advances scheduled payments and meets its obligation to pursue recovery on the defaulted mortgage loans (as required by §§ 4.14 and 7.01 of the Guaranty Agreement), it fulfills its obligations with respect to those loans.

GNMA, without disputing that this procedure is proper with respect to "delinquent" or defaulted mortgages, counters that the mortgages here in question are entirely "liquidated" and no longer in the pools. To permit an issuer to continue to advance "scheduled" payments on non-existent mortgages, GNMA argues, is senseless and violates § 1721(g), which requires that outstanding securities be "based on and backed by" pooled mortgages. GNMA maintains (and Guardian concedes) that under Guardian's view of the program, a gap arises, in which an issuer not receiving otherwise valid "prepayments" made by a guarantying agency can proceed indefinitely with "scheduled payments" on extinguished mortgages. Under such an arrangement, of course, the outstanding securities would not be fully collateralized.

While we agree that if Guardian's view of the program is correct, a gap results, it is nonetheless possible to reject the government's position (that Guardian has an immediate duty to advance the unpaid balance here in question before determination of whether the VA validly fulfilled its guaranty obligation by offset) without necessarily accepting Guardian's position (that regardless of whether VA fulfilled its guaranty

obligation, an issuer has no duty to pay forward the unpaid balance of liquidated mortgages until it receives prepayment).

■ Although the language of the regulations, the Guaranty Agreement, and the contract under which modified pass-through securities are issued is less than lucid, we conclude that, during the period in which an issuer seeks to collect on its mortgage loan and on its guarantees, its only duty is to advance scheduled payments from its own funds.[7] With respect to the post-collection period, no present finding is necessary (see *infra*). Although the mortgages here have been foreclosed, the guaranty obligation of the VA with respect to those mortgages may well remain. Much of the difficulty of the present case stems from the fact that the collection period has dragged on for more than three years. While it is arguable that Guardian has breached its obligation under the Guaranty Agreement to pursue all collections with "due diligence" (see §§ 4.14 and 7.01), it seems more equitable, on the particular facts of this case, to allow Guardian to press its claims against the VA to their conclusion. Part of the delay is attributable to the VA's failure to make its position immediately clear. It also appears that Guardian entertained a good faith belief that the proceedings noted above between the United States Government and Eastern would clarify its claim against VA and that much of the delay occurred while Guardian was waiting for those proceedings to conclude. Furthermore, it is not disputed that Guardian has faithfully advanced scheduled payments from its own funds throughout this period under a reasonable, and this court decides correct, belief that this was its only obligation during the collection period. Finally, GNMA appears to have accepted this state of affairs until quite recently (it is not clear whether GNMA was previously aware of the VA's earlier refusals to pay Guardian on its guaranty claim). While such a prolonged collection period is highly undesirable, Guardian's behavior seems reasonable.

This interpretation seems consonant not only with the contractual and regulatory language noted above, but also fair to the issuer and true to the expectations of holders of "modified pass-through" securities. It is clearly important to the holder of such a security that he be able to count on each scheduled installment of interest and principal. The essence of the "modified pass-through" security (as opposed to the straight pass-through) is the guarantee that scheduled payments will be made whether or not collected, and the purchaser of such securities is entitled to rely on those payments. However, the purchaser has, at any given time, no expectation with respect to prepayments stemming from defaults and foreclosures. Such events, by definition, are unpredictable. Although the security holder has a right to expect generally that his securities will be "based on and backed by" pool mortgages, a certain amount of delay before receipt of his pro rata share of any liquidation payments should not be burdensome to any given holder, since such a "prepayment" is by definition unexpected.[8] Furthermore, since each holder receives only a pro rata share of such a prepayment, the absolute amount of money involved is not likely to be great. By contrast, the absolute amount of money involved for an issuer required to make a lump sum advance can be substantial. Since, under GNMA's view, the most whimsical and unpredictable refusal of a guarantying agency

---

7. It is not necessary, at this point, to determine the precise duration of the "collection period." Suffice it to say that it will continue, in this case, at least until Guardian's guaranty claims against the VA are decided.

8. A brief delay following foreclosure seems reasonable to provide an issuer with an opportunity to collect on his guaranties. Such a delay would not render the securities less desirable. Issuers are required to maintain excess collat-

eral in their pools consisting of "assets acceptable to GNMA" in an amount equal to 3% of the amount of securities outstanding. See 24 C.F.R. § 390.11; Guaranty Agreement § 4.17. Furthermore, since the full faith and credit of the United States Government ultimately stands behind these securities, it is hard to imagine that the immediate interposition of the credit of the issuer during the collection period would increase their safety.

to meet its guaranty obligation could trigger an immediate duty to pay forward large sums, the incidence of issuer default under the program could .be substantially increased. This, of course, would cast upon GNMA the responsibility to pay such lump sums forward and also to undertake the duties of managing the pools inherited from defaulting issuers.

It should be stressed that the holding in this case applies only during the collection period. Although the court leaves open the question raised here by Guardian (see *infra*), several observations seem in order. Guardian's view—that it may simply continue ad infinitum to advance scheduled payments on non-existent mortgages— would leave a serious gap in the mortgage backed securities program. This view carries "to a dryly logical extreme" the contractual and regulatory language discussed above. Although this language has been ·construed as requiring an issuer only to pass through prepayments as received, it seems very likely that the language was only intended by its drafter to apply to conventional cases where prepayment by a guarantying agency and receipt of that prepayment by an issuer are simply two sides of the same coin. It should not be blindly applied if the aberrational and unforeseen situation should arise in which a "prepayment" has been made by a guarantying agency but not received by an issuer. See generally Farnsworth, *Disputes over Omissions in Contracts*, 68 Colum.L.Rev. 860, 873–76 (1968). Guardian's suggestion that "scheduled" payments on foreclosed mortgages can go on forever seems very doubtful. Therefore, although there is no express time limitation in the language construed above, that language should not be read as governing the ultimate question of where the loss in the present case should fall if the VA should prevail. The question should be resolved as an "omitted case"—i. e. a result should be reached which conforms to the actual expectations of the par-

ties and which conforms to standards of fairness in the trade. *Id.* at 876–81.

With respect to the former, it is noteworthy that the GNMA Guide, *supra* at 4–1, provides that:

"Losses to the issuer in connection with servicing, including risks which are customarily assumed by the mortgage investor, may result from a number of predictable circumstances. Following, are some of the costs . . . assumed by the issuer of a GNMA pool:

.    .    .    .    .

(3) Loss of principal on foreclosure."

The court also notes the obvious intention expressed in 12 U.S.C. § 1721(g) that securities outstanding under the program be "based on and backed by" mortgages.[9]

### B.    *Guardian's Claims*

1. As noted above, Guardian's claim is more than merely the negative of GNMA's claim. Under the Government's view, Guardian is obliged to advance the unpaid balance of the loans in question *now*, regardless of the outcome of its pending claims against the VA. Under the view adopted by Guardian, on the other hand, the issue raised may never have to be decided. If this court should determine that the VA wrongfully offset against Eastern the amount of the guaranty claims now asserted by Guardian, then Guardian would receive the Guaranty payments on the loans in question, the payments would simply be passed through to security holders, and this court's decision would become moot. A decision on the question put before the court by Guardian only becomes necessary if VA vindicates its offset and therefore compels this court to conclude that a payment has been made on the guaranties in question, but not received by the issuer. Since it is entirely possible that the outcome of Guardian's claims against the VA will render unnecessary any decision on the issue raised here by Guardian, the issue is not yet ripe

---

9. It should be noted that the VA's guaranty on mortgages is sometimes not a 100% guaranty. Therefore, it is clear (and conceded by Guardian) that Guardian has ultimate responsibility for satisfying some part of the unpaid balance on a defaulted pool mortgage. See Guardian's Brief at 23, ftn.

for adjudication and, in any event, should not be decided now as a matter of sound judicial discretion.

■ Although the government has not raised the question of ripeness, it is well established that a court may raise the question of its own motion since it goes to the subject matter jurisdiction of the court. *Duke City Lumber Co. v. Butz*, 176 U.S. App.D.C. 218, 219, 539 F.2d 220, 221 n. 2 (1976), *cert. denied*, 423 U.S. 1039, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977). This seems generally to be so regardless of whether the ripeness problem deprives an issue of minimal Article III "case or controversy" requirements or whether it is based solely on the discretionary or "prudential" aspects of the ripeness doctrine. Wright & Miller, *Federal Practice and Procedure*, § 3532 at 241; cf. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 138, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) (Court must raise prudential ripeness considerations on its own motion when called on to decide constitutional questions).

In the present case, it is clear that the necessity for a decision on the issue raised by Guardian will not arise until it is determined that the VA's asserted set-off was validly made and that it constituted a prepayment and eliminated the VA's guaranty obligation. The case, therefore, is in much the same posture as those cases in which an indemnitor has sought a declaration that it is not liable to indemnify an indemnitee before any judgment has been rendered against the indemnitee. In such situations, it has been held that there exists no immediate controversy and that declaratory relief is therefore inappropriate until the duty to indemnify arises. See *Cunningham Bros., Inc. v. Bail*, 407 F.2d 1165, 1167 (7th Cir.), *cert. denied*, 395 U.S. 959, 89 S.Ct. 2100, 23 L.Ed.2d 745 (1969); *National Valve & Mfg. Co. v. Grimshaw*, 181 F.2d 687, 689–90 (10th Cir. 1950). See also *Tilley Lamp Co. v. Thacker*, 454 F.2d 805, 808 (5th Cir. 1972) (plaintiff seeks declaration that defendant must indemnify him for any liability arising from possible future products liability actions); *Lizza & Sons, Inc. v.*

*Hartford Accident & Indem. Co.*, 247 F.2d 262, 265 (1st Cir.), *cert. denied*, 355 U.S. 906, 78 S.Ct. 332, 2 L.Ed.2d 261 (1957) (surety seeks declaration that its bond is void before any damages are assessed against its principal).

■ Even if the requisite "case or controversy" exists here, the decision as to whether to grant declaratory relief is within the sound discretion of the court. See, e. g., *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 494, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942); *Holup v. Gates*, 544 F.2d 82, 85 n. 3 (2d Cir. 1976), *cert. denied*, 430 U.S. 941, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977); *Panama Processes S. A. v. Cities Service Company*, 362 F.Supp. 735 (S.D.N.Y.1973), *aff'd*, 496 F.2d 533 (2d Cir. 1974). See generally Wright & Miller, *Federal Practice and Procedure* § 2759. In deciding whether to exercise its discretion, a court should consider whether declaratory judgment "will serve a useful purpose in clarifying and settling the legal relations in issue and . . . terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding." Borchard, *Declaratory Judgments* 299 (2d ed. 1941). This formulation has been adopted in this circuit, see *Broadview Chemical Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1968), *cert. denied*, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970), with the admonition that, if either of these objectives can be achieved the action should be entertained." *Id.* Also to be considered in deciding whether to grant declaratory judgment is whether the grant will lead to "piecemeal litigation", *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 324 (4th Cir. 1937), and whether the granting of declaratory judgment might result in the increased congestion of the federal courts. *Travelers Ins. Co. v. Davis*, 490 F.2d 536, 544 (3d Cir. 1974). In the present case, the declaration sought will not settle the legal relations in issue at the present juncture nor will it terminate the controversy giving rise to the proceeding. If it should be decided, as Guardian would have it, that Guardian has no duty to advance unscheduled payments

from its own funds, Guardian, by its own concession,[10] would still be obliged, as issuer, to pursue all available remedies against the non-paying guarantying agency. See Guaranty Agreement §§ 4.14, 7.01; GNMA Guide, *supra*, Chap. 11, § 11–1(n) at 11–3. If it should be decided that Guardian must advance validly made guaranty payments which remain uncollected, it would still be necessary, to proceed with a determination of the validity of the VA's purported set-off. Guardian, therefore would remain uncertain about its obligations until the conclusion of that future proceeding. Viewing the present controversy as a whole, it is hard to see any useful purpose that might be served by an immediate decision of Guardian's claim. The best that can be said is that a decision in favor of Guardian would establish that, whatever the outcome of subsequent proceedings, Guardian need not advance in a lump sum its own funds. But Guardian is in no immediate danger of having to advance its own funds. Such a duty can only arise if it is established that the VA properly offset its guaranty obligations. A decision against Guardian, of course, would resolve nothing. Under the circumstances, declaratory judgment seems inappropriate. Compare *Panama Processes S. A. v. Cities Service Co.*, 362 F.Supp. 735, 738 (S.D.N.Y.1973), *aff'd* 496 F.2d 533 (2d Cir. 1974). This seems especially so since no matter how the court decides the question presented, it will not cut off further proceedings. Therefore, considerations of judicial economy and the avoidance of piece-meal litigation militate toward a refusal to grant declaratory judgment here.

2. Guardian also argues that, under general principles of contract law, its assumption of the duties of an issuer in its assignment agreement with Eastern was in consideration for its receipt of all rights of an issuer. One such right, Guardian argues, is the right to "file, process and receive the proceeds for . . . guaranty claims under the laws of the United States . .." Guaranty Agreement § 4.14. Accordingly, Guardian seeks a declaration that "if, as the VA contends, Guardian never received any effective and enforceable right to 'receive the proceeds' of the guaranty claims with respect to the mortgages involved in this dispute, then Guardian is excused from any further obligation with respect to those mortgages." Guardian's Brief at 17. The enforceability of Guardian's "right to receive" payments, of course, is precisely the subject of Guardian's pending claims against VA.

Once again, Guardian seeks to place itself in a position whereby it cannot lose in the pending litigation against the VA.[11] If Guardian wins in that action, of course, the guaranty money is simply passed through, and the declaration which Guardian calls on this court to make is meaningless. If Guardian should lose, then Guardian hopes to be able to invoke the declaration sought here to avoid any liability. We conclude for the reasons expressed above, that this possibly unnecessary resolution of the issue posed here is currently inappropriate for declaratory judgment.

---

10. Guardian characterizes the issuer's duty upon default as follows:

". . . the issuer's obligation after a mortgage goes into default is to advance the regular monthly interest and principal payments while it pursues recovery from the mortgagor, the underlying property or the appropriate insuring or guarantying agency of the government."

Guardian's Brief at 18. Diligent pursuit of recovery against a recalcitrant guarantying agency would certainly include prompt legal action.

11. The security holders, of course, could still lose. Without questioning the sincerity of Guardian in its efforts to protect the interests of its security holders, the court notes that a decision for Guardian now on either one of its claims would render Guardian's pending claims against the VA a good deal less pressing so far as Guardian is concerned. The declaration sought here, of course would totally eliminate any future possibility of loss on these mortgages. The declaration sought by Guardian under its first claim would only eliminate any possibility of a lump sum payment and would leave open Guardian's duty to make scheduled advances. Both declarations, however, would tend to soften the potential impact of an adverse decision on Guardian without any corresponding impact on security holders. If for no other reason, it may be desirable to withhold decision on these matters until the VA action in order to insure that no efforts are spared for the protection of the security holders.

Furthermore, the proposition advanced by Guardian is somewhat doubtful. For if it should ultimately be found that VA acted properly and offset in accordance with its regulations, that would seemingly cut off any "right to receive" guaranty payments under § 4.14 of the Guaranty Agreement. That section provides that the issuer "shall . . . file, process and receive the proceeds from the mortgage insurance or guaranty claims . . . *in conformance with and subject to all applicable rules . . . of the applicable United States insuring or guarantying agency . . .*." Thus the right to receive proceeds assigned to Guardian appears not to be an absolute right. However, since a decision on this question at present would serve no useful purpose, we simply conclude that, as a matter of discretion, we will not grant declaratory judgment.

It is so ordered.

## ON MOTION TO REARGUE

Government National Mortgage Association (GNMA) moves, pursuant to General Rule 9(m) of the United States District Courts for the Southern and Eastern Districts of New York, for reargument of its motion for summary judgment decided by this court on January 8, 1979. GNMA bases its motion on several grounds, all of which, in its view, should lead us to conclude that the "collection period"—i. e. the period within which a GNMA issuer is required to complete its collection efforts—should be deemed to have already ended for Guardian in connection with the mortgage loan guarantees at issue here. At oral argument on its motion, GNMA also urged that, for policy reasons, we reconsider our January 8th decision and hold that GNMA issuers have a duty to pay from their own funds amounts equal to "prepayments" made by government agencies guaranteeing pool mortgages but not received by issuers, and that this duty is triggered solely by the guaranteeing agency's decision that its guaranty obligation has been discharged.

■ As this court has recently noted, "the only proper ground for [granting] a motion for reargument is that the court has overlooked 'matters or controlling decisions' which, had they been considered, might reasonably have altered the result reached by the court." *United States v. International Business Machines Corp.*, 79 F.R.D. 412, 414 (S.D.N.Y.1978); *United States v. N. V. Nederlandsche Combinatie Voor Chemische Industrie et al.*, 75 F.R.D. 473 (S.D.N.Y. 1977).

■ To the extent that GNMA urges us, for policy reasons, to reconsider our decision, we decline. The government, in its assertion that the decision of the guaranteeing agency with respect to whether it has fulfilled its guaranty obligation should be conclusive for purposes of triggering a GNMA issuer's alleged duty to pay from its own funds an amount equal to that obligation, merely repeats its previous position and asserts we were wrong. This is not a proper basis for the grant of a motion for reargument. See *United States v. International Business Machines Corp., supra*, 79 F.R.D. at 414. If GNMA is dissatisfied with the "due diligence" standard set forth in our prior opinion, it is free to appeal or, perhaps, to rewrite its own standard form Guaranty Agreement which appears to establish that standard.

GNMA has referred us to no "controlling decisions", or for that matter, any decision at all, which might alter our prior ruling.

GNMA does, however, assert that we overlooked certain matters which might change our January 8th decision. First, it argues that we overlooked a settlement agreement entered into March 23, 1978 between Eastern Service Corp., Guardian's predecessor in interest, and the United States Government, in which Eastern is said to have released all its claims against the government. Since this general release is said to have encompassed the VA guaranty obligations at issue here, GNMA argues that the collection period on those guarantees necessarily ended at that point, thereby triggering a duty on Guardian's part to pay forward the unpaid balances of the defaulted pool loans. We did not, however, over-

look this agreement. Rather we considered the effect of the agreement to be at issue in the two claims in Guardian's pending action against the VA, which calls on us to determine whether the VA, either by its purported set off or by the settlement agreement, has discharged its guaranty obligations. Since these questions were specifically held apart from the issues presented for our January 8th decision, we intentionally did not consider them at that time. Should it be determined, in the pending dispute between Guardian and the VA, that the March 23, 1978 settlement agreement fully discharged the VA, we will then have to consider whether a GNMA issuer has any duty to pay from its own funds an amount equal to "prepayments" made by a guaranteeing agency but never received by the issuer. The point of our January 8th decision was that, assuming an issuer proceeds with due diligence, the collection period would run at least until an initial judicial determination of whether the guaranteeing agency has in fact satisfied its guaranty obligation and therefore triggered whatever duty an issuer may be found to have to advance its own funds.

GNMA also asserts that we overlooked the fact that Eastern had cancelled and surrendered two VA guaranty certificates which represented the VA's obligation with respect to two of the eight mortgage loans in question here. From this surrender, GNMA concludes that the collection period must have been concluded with respect to those two loans. We did not "overlook" this information, because it was not presented to us. GNMA, for the first time on this motion to reargue, attaches as "exhibits" to its motion the two cancelled certificates. A motion for reargument is not the place for the introduction of such new factual material "unless directed by the court" (Rule 9(m)). Furthermore, it appears from papers filed in this case that even the VA did not deem its obligation discharged by the mere fact that the certificates here had been surrendered. The certificates were cancelled respectively on April 30, 1975 and June 10, 1974. Yet VA purported to "offset" the obligation, which

we may infer that it deemed still to exist, on October 1, 1975. We therefore deny reargument on the basis of these certificates. However, we note that the VA (which is represented in this action by the same counsel as GNMA) is not foreclosed from submitting the certificates to show that it has discharged its guaranty obligations with respect to these two claims in connection with its pending motion for summary judgment against Guardian.

Quoting our remark that GNMA security holders have "no expectation with respect to prepayment stemming from defaults and foreclosure," GNMA argues that we overlooked the "customary practice of mortgage investors to take prepayments into account in computing probable yields." It was stated in the January 8th decision that:

> "The essence of the 'modified pass-through' security (as opposed to the straight pass-through) is the guarantee that scheduled payments will be made whether or not collected, and the purchaser of such securities is entitled to rely on those payments. However, the purchaser has, *at any given time*, no expectation with respect to prepayments stemming from defaults and foreclosures. Such events, by definition, are unpredictable. Although the security holder has a right to expect generally that his securities will be 'based on and backed by' pool mortgages, a certain amount of delay before receipt of his pro rata share of any liquidation payments should not be burdensome to any given holder, since such a 'prepayment' is by definition unexpected." (Emphasis supplied)

Although this language seems clear, it may be helpful to explain it further. A distinction is drawn in the regulations and instruments governing the duties of a GNMA issuer between "prepayments" and "scheduled payments". The latter provide for a predictable minimum amount payable from month to month. To insure that a GNMA security holder can rely on receiving these minimum "scheduled payments" as they fall due, the issuer is clearly obliged to meet such payments "whether or not collected"

**422**

from the pool mortgages. 24 C.F.R. § 390.-5(a). These scheduled payments are subject to occasional increase by "prepayments" arising from defaults and foreclosures on pool mortgages. These are naturally not predictable *"at any given time"* (the language cited above from our decision of January 8, 1979). Therefore, a security holder does not rely on such a payment in any given month at the time of his investment. We do not dispute that he has an actuarial expectation that, over time, a certain incidence of default may occur on a given pool. That expectation is fully protected by our opinion. However, since at any particular moment there is no expectation of or reliance on such payments, it is reasonable that the issuer is not required to advance the payment immediately from his own funds. We believed, and still believe, that this helps to explain the different duties imposed on GNMA issuers by contract and regulation with respect to scheduled payments and prepayments.

The last and most substantial ground advanced by GNMA is that we improperly concluded that Guardian has exerted the "due diligence" required of it in its contract with GNMA in the prosecution of its collection duties in connection with the loans at issue here. GNMA does not argue that we "overlooked" anything, but rather maintains that since neither party had argued a "due diligence" theory, the record on which we rendered our determination was inadequate. GNMA seems also to maintain that the record was inadequate not only with respect to Guardian's collection efforts but also with respect to those of Eastern Service Corporation—apparently on the theory that Eastern's delinquencies in collecting on its loans are attributable to Guardian by virtue of the chain of assignments of issuer status running from Eastern to Guardian. Guardian argues, in opposition, that we fully considered this question and that, in any event, any effort to try the question would be futile since our decision on the merits of Guardian's pending claims against the VA would render the issue academic. Guardian does not respond to whether it may be held for any lack of due diligence which may be shown on Eastern's part.

We believe that GNMA's motion for reargument should be granted insofar as GNMA seeks to provide a fuller record as a basis for determining "due diligence" as well as any arguments it wishes to raise in connection with the issue of whether Guardian may be held for Eastern's failure to exercise due diligence in its collection efforts. The mere fact that Guardian may prevail in its pending claims against the VA does not alter the fact that Guardian has a clear contractual obligation to proceed in its collections on behalf of the pools with due diligence. Guaranty Agreement §§ 4.14, 7.01. Presumably GNMA could recover for any loss caused to security holders by undue delay.

In sum, we adhere to our holding that during the period in which an issuer seeks with due diligence to collect on its mortgage loan and on its guarantees, its only duty is to advance scheduled payments from its own funds. However, GNMA's motion for reargument is granted to the extent it seeks to provide a more complete record on the question of due diligence.

It is so ordered.