HATCO CORPORATION, Plaintiff,

v.

W.R. GRACE & CO.—CONN., Defendant, Third–Party Plaintiff,

v.

ALLSTATE INSURANCE CO., et al., Third–Party Defendants.

Civ. A. No. 89–1031.

United States District Court, D. New Jersey.

April 29, 1994.

Aubrey M. Daniel, III, Paul Mogin, Evan Roth, Eric M. Braun, Dane Butswinkas, Williams & Connolly, Washington, DC for plaintiff.

Thomas H. Sear, Randy Paar, Elizabeth A. Sherwin, Erik T. Sorensen, Paul N. Farquharson, Anderson, Kill, Olick & Oshinsky, New York City, for defendant-third party plaintiff Grace.

## *OPINION*

WOLIN, District Judge.

Currently pending before the Court are three motions for reconsideration of the Court's Opinion—*Hatco Corp. v. W.R. Grace & Co.*, 836 F.Supp. 1049 (D.N.J.1993) (the "Apportionment Opinion"), and the related Order dated November 1, 1993. Plaintiff Hatco has filed two motions, one concerning Hatco's contribution claim under the New Jersey Spill Compensation and Control Act, and the other regarding paragraph 4 of the Order. Defendant Grace has also filed a motion for reconsideration, taking issue with

various aspects of the apportionment scheme set forth in the Apportionment Opinion. The Court has reviewed the parties written submissions and has considered the motions pursuant to Federal Rule of Civil Procedure 78.[1]

Before turning to the parties' motions, it serves to note that the Court has not been idle during the months intervening the issuance of the Apportionment Opinion and the current consideration of the pending motions. During this time, the Court thrice amended the 110–page Apportionment Opinion and also issued a related 125–page Opinion, dated March 1, 1994 (the "Allocation Opinion"), in which the Court allocated between the parties costs incurred to remediate the environmental contamination at the Fords property, in accordance with the apportionment scheme predominantly established in the Apportionment Opinion. As a consequence, the Court has, without intention, already addressed certain of the issues raised in the pending motions.

## A. Standard of Review

A motion for reconsideration, brought pursuant to Local Rule 12(I), may address only factual and legal matters that the Court may have overlooked. This statement gives rise to two limitations that control the Court's review.

■ First, a motion for reconsideration will only succeed where "dispositive factual matters or controlling decisions of law" were presented to the Court but not considered. *Pelham v. United States*, 661 F.Supp. 1063, 1065 (D.N.J.1987). A motion for reconsideration is not an appeal. It is improper on a motion for reconsideration to " 'ask the Court to rethink what [it] had already thought through—rightly or wrongly.' " *Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co.*, 744 F.Supp. 1311, 1314 (D.N.J.) (quoting *Above the Belt v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D.Va.1983)). Thus, a party "must show more than a disagreement with the court's decision." *Panna v. Firstrust Sav. Bank*, 760 F.Supp. 432, 435 (D.N.J. 1991). A mere "recapitulation of the cases

and arguments considered by the court before rendering its original decision fails to carry the moving party's burden." *Carteret Sav. Bank, F.A. v. Shushan*, 721 F.Supp. 705, 709 (D.N.J.1989).

Instead, the moving party is obligated to point out controlling facts or dispositive case law that the Court necessarily overlooked in rendering its decision. Very often, this obligation requires the moving party to produce "newly discovered, non-cumulative evidence." *Oritani S & L*, 744 F.Supp. at 1314 (citing *Johnson v. Township of Bensalem*, 609 F.Supp. 1340, 1342 n. 1 (E.D.Pa.1985)).

■ Second, the rule "does not contemplate a Court looking to matters which were not originally presented." *Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.*, 680 F.Supp. 159, 162 (D.N.J.1988). Indeed, there is a strong policy against entertaining reconsideration motions based on evidence that was readily available at the time that the original motion was heard, but, for whatever reasons, was not presented to the Court. As a result, the court may, in its discretion, refuse to consider such evidence. *Florham Park Chevron*, 680 F.Supp. at 162–63.

■ It should be noted, however, that if a court finds that its consideration of evidence offered for the first time on a motion for reargument may lead to a different result than was reached originally, the court has discretion to consider it. *Panna*, 760 F.Supp. at 435. In its discretion, the Court may grant a motion for reconsideration where the record was inadequately developed on a particular issue. *New York Guardian Mortgagee Corp. v. Cleland*, 473 F.Supp. 409, 422 (S.D.N.Y.1979).

■ But, the Court is also aware that relief under Rule 12(I) should only be granted "very sparingly." *Maldonado v. Lucca*, 636 F.Supp. 621, 630 (D.N.J.1986). Moreover, Local Rule 12(I) obligates the moving party to concisely specify the suspect aspects of a court's opinion with all due particularity.

---

1. Certain terms defined in the Apportionment Opinion are incorporated and utilized here without reference.

It is with these standards in mind that the Court reviews the parties' arguments.

## B. Hatco's Motion Regarding the Spill Act

■ In the Apportionment Opinion, the Court addressed Hatco's claim for contribution under the Spill Act and concluded that compliance with the National Contingency Plan ("NCP") was a condition for recovery under the Spill Act. *See* Allocation Opinion, 836 F.Supp. at 1093. In one of its pending motions, Hatco has urged the Court to reconsider whether NCP compliance is an element of a cause of action for contribution under the Spill Act.

The Court will not reexamine the issue here and refers the parties to the Allocation Opinion, wherein the Court concluded that Hatco substantially complied with the relevant NCP provisions while undertaking the various remediation projects which to date have been the subject of the pending cost recovery action. *See* Allocation Opinion, Conclusions of Law ("COL") ¶¶ 61–74. Given this determination, the Court concluded that Hatco could recover under the Spill Act regardless of whether NCP compliance is a requirement under the Spill Act. *Id.* at COL ¶ 87. Accordingly, the Court advised that its earlier assessment of the NCP's relevance to the Spill Act should be viewed as nonbinding and thus expressly left to another day—and to another court—the question of whether NCP compliance is prerequisite for recovery under the Spill Act. *Id.*

## C. Hatco's Motion Regarding Paragraph 4 of the Order

■ In formulating the apportionment scheme set forth in the Apportionment Opinion, the Court recognized that much of the remediation at the Fords property may be driven by PCB contamination, a majority of which has been attributed to Grace. The Court expressed concern that Hatco might, as a consequence, enjoy a "free ride" when other contaminants (BNs and VOCs) for which Hatco has been assigned a comparatively greater portion of responsibility, are removed along with the PCBs.

To settle this concern, the Court initially determined that

> [i]n areas of that contain PCBs and other categories of contaminants ... Grace will be able to deduct Hatco's share of the response costs that would have been incurred if no PCBs were present. Otherwise, Hatco would bear no financial responsibility for the release of chemicals during its fourteen years of operation.

*See* Apportionment Opinion, COL ¶ 38 n. 29 (language existing prior to Order dated February 18, 1994, amending the Apportionment Opinion—Specifically footnote 29). Paragraph Four of the Order ("Paragraph Four") tracks the language of the earlier footnote 29. On its pending motion, Hatco asserts that the language of Paragraph Four is too general, which consequently leaves the Court's intentions subject to various and inaccurate interpretations.

The Court speculates that Hatco's fears have been assuaged by the language of the revised footnote 29, which reads in pertinent part: "In areas that contain PCBs and other categories of contaminants, Grace will be able to deduct Hatco's share of the response costs that have or would be incurred in excess of the response cost allocated to PCB removal." Apportionment Opinion, 836 F.Supp. at 1089 n. 29.

The Court will not delve into the hypothetical problems proffered by Hatco on the pending motion, but again refers the parties to the Allocation Opinion, in which the Court undertook to explain the revised footnote 29. *See* Allocation Opinion, COL ¶ 142. Given the revision and the subsequent explanation, the Court is satisfied that its ruling and apportionment scheme may be readily applied to allocate response costs without engendering an inordinate amount of confusion or controversy.

The Court recognizes that there may potentially exist a set of circumstances or conditions at the Fords property that may not conform to the current apportionment and allocation model. However, such circumstances have not been presented for consideration and the Court will not address such potentialities here. Paragraph Four has been clarified, but for purposes of uniformity,

the Court will amend the language of Paragraph Four so it tracks the language of the revised footnote 29.

## D. Grace's Motion

Grace asserts that the Court's apportionment scheme suffers from several inconsistencies and factual errors, specifically: (1) the Court overlooked and did not factor the benefits deriving from Grace's 1971 pond elimination program, and failed to recognize that the ponds occupied only a fraction of the ponds region (AEC 2); (2) the Court erred in allocating to Grace responsibility for the presence and clean-up of certain contaminants—benzene, TCA, TCA daughter products, xylene and metals; and (3) the Court failed to allocate to Hatco the costs of PCB remediation in Well 17S.[2]

■ Given the applicable standard of review for reconsideration motions, the Court is not satisfied that certain of the issues raised by Grace are appropriate matters for reconsideration. Local Rule 12(I) does not serve as vehicle by which a dissatisfied party may press a court to justify or explain a decision. However, the Court also acknowledges that some of Grace's arguments have merit and as a consequence, the Court may be inclined to clarify or modify the Apportionment Opinion if necessary.

### 1. The Ponds and the Ponds Region

In its brief supporting the pending motion, Grace asserts that the Court incorrectly apportioned liability in the ponds area (1) by failing to account for the 1971 pond elimination program and (2) by applying an inappro-

priate formula for apportionment of PCB contamination in both the areas near the ponds and in the entire ponds region (AEC 2).

Grace asserts that the Court incorrectly applied a full use/partial use analysis to the ponds area because such a formula allegedly fails to account for the pond elimination program. In short, Grace contends that the pond elimination program ended its full use of the ponds, leaving behind only identifiable pockets of contaminated soil. Thus, the balance of the subsurface soil should have been apportioned by time-of-use given the use of backfill and the impact of other surface events affecting the area.

■ The Court rejected once—and rejects again—Grace's proffered theories with respect to the former ponds area. The pond elimination program and its deleterious effects were expressly the subject of numerous factual findings by the Court. Apportionment Opinion, 836 F.Supp. at 1066–68. The Court is satisfied that the formula set forth in the Apportionment Opinion reflects an accurate characterization of the contamination in the former ponds area. The Court's analysis may be hard for Grace to accept, but should not be difficult to comprehend. In fact, Grace exhibits a keen understanding of the circumstances when it points out that despite the fact that 7,000 tons of contaminated soil were removed during the pond elimination program, the fact remains that "Grace bears the identical share of liability with or without having undertaken the pond elimination program." Grace's Reply Brief at 3. This is true and the Court concludes this is rightly so.

2. As an aside, Grace also suggests that the analysis underlying the Apportionment Opinion is deficient, but that such deficiencies are "best left for appeal." Actually, this particular grievance may be raised only on appeal. Nonetheless, Grace provides a preview of certain of the issues it may raise before the Third Circuit Court of Appeals, specifically asserting that the Court failed to accord any weight to the equitable factors bearing upon the apportionment percentages, including Grace's allegations that Hatco disregarded the site's known conditions, lied to environmental officials and purposefully delayed and deferred remediation of the site.

Despite the 112–page length of the Apportionment Opinion, the Court assumes that Grace has

read it closely. Thus, the Court must also assume that Grace has conveniently, rather than accidentally, overlooked the Court's explicit discussion and consideration of the aforementioned equitable factors and relevant facts. Apportionment Opinion, 836 F.Supp. at 1076–86, 1090–92. See also Allocation Opinion, COL ¶ 91. Grace's choice of words—the Court "fail[ed] to accord any weight"—speciously describes the Court's treatment of the equitable factors. However, given the proportion of liability assigned to Grace, the Court is not surprised by Grace's stance. Nonetheless, in the Court's view, "choosing" to accord some, little or no weight to the equitable factors is very different from "failing" to accord them any weight.

Grace fails to grasp the relevance of the pond elimination program to the Court's analysis. Although Grace may deserve kudos for undertaking the pond elimination program, the Court expressly found that Grace did not deserve the same high marks for the manner in which the program was implemented. At issue here is not the soil that was removed and discarded by Grace through the pond elimination program, but rather, the contaminated soil that was carelessly spread throughout the former ponds area during this particular remediation effort.

To the extent the Apportionment Opinion remains ambiguous regarding the relevance of the pond elimination program to the Court's utilization of a full use/partial use appointment formula for the former ponds area, the Court adopts Hatco's proposed supplemental findings, but only for purposes of clarification:

> The Court's apportionment of the actionable contamination in AEC 2 takes into account the effect of the pond elimination program. Although that program removed a large volume of contamination from the site, Grace also left behind a large volume of contamination which is the direct result of Grace's full use of the ponds. The methods employed in the pond elimination program also spread the remaining contamination throughout the area, contaminating the surrounding soil and even the backfill brought into the area.

> The determination in AEC 2 that one month of partial use equates with two days of full use also takes into account the effect of the pond elimination program. "Full use" refers to the amount of contamination that was caused by Grace's operation of the ponds and was left behind after the completion of the pond elimination program. The Court determined the ratio between the partial and full use by comparing the impact of surface runoff in the ponds region with the contamination left behind after Grace's completion of the pond elimination program.

Hatco's Opposition to Grace' Motion at 12.

 The Court also rejects Grace's arguments that even under the Court's analysis, Grace's full use of the ponds should not have been cited for apportionment of PCB contamination in the portions of AEC 2 outside the immediate vicinity of the ponds and muck storage areas. Grace asserts that PCB contamination in these outlying areas of AEC 2 should have been apportioned by a straight time of use formula given the impact of surface water and spill events. The Court, however, already rejected such a finding. *See* Apportionment Opinion, 836 F.Supp. at 1068 (stating that "it is unlikely that subsequent periodic impacts to the surface soils redistributed PCBs" spread by Grace over AEC 2 during the pond elimination program).

Grace's exclusive use—or more specifically, its closure—of the former ponds resulted in dispersement of PCBs throughout AEC 2 via regarding, tracking by equipment and diversionary trenching. *See* Apportionment Opinion, 836 F.Supp. at 1066–68. The Court stands by its findings.

### 2. VOCs

Grace also asserts that the Court disregarded the evidence presented and incorrectly utilized a time-of-use formula to apportion liability for incidents of VOC contamination in the following areas: (1) the sludge layer above the east lagoon (AEC 1); (2) the Ester I complex; (3) Ester I tank farm (AEC 9A); (4) the ZAA complex (AEC 19); and (5) the groundwater. Grace argues that Hatco should be fully responsible for these VOC occurrences, which are attributable, according to the Court's findings, to chemicals used exclusively by Hatco. Where appropriate, the Court will address each area separately.

#### a. East Lagoon

 Grace contends that although Hatco was assigned full responsibility for contamination involving TCA daughter products or benzene, the Court apportioned VOC contamination in the sludge layer of the east lagoon by time-of-use despite finding that the only actionable VOCs in the sludge layer were TCA daughter products and benzene. However, while Hatco was assigned full responsibility for actionable TCA daughter products, such was not the case with respect to actionable benzene.

Grace points to the Court's finding that benzene and other chemicals were used or stored at the site after Hatco purchased the property. *Id.* at 1056. In this particular finding of fact (paragraph 26), the Court did not conclude that benzene and the other chemicals, including toluene, were introduced to the property exclusively by Hatco. In fact, the Court found elsewhere that Grace too was responsible for the introduction of toluene to the site. *See id.* at 1060.

Consequently, Grace has mistakenly assumed that the Court found Hatco to be the sole source of benzene at the site. There is no internal inconsistency with respect to VOC contamination in the sludge layer of the east lagoon. As Hatco has explained, evidence was presented to the Court indicating that Grace also introduced benzene to the site. *See* Hatco's Opposition Brief at 16–17. Thus, given the mix of benzene and TCA daughter products in the east lagoon's sludge layer, time-of-use was the appropriate formula for apportionment of VOC contamination in that area.

### b. Ester I Complex and the Ester I Tank Farm

▇▇▇ Grace also argues that the only actionable VOC found in the Ester I complex (AEC 4) and the Ester I tank farm (AEC 9A) was xylene, another VOC attributed solely to Hatco. Apportionment Opinion, 836 F.Supp. at 1060. Grace also has misconstrued the apportionment analysis here and as a consequence, its argument lacks merit. Although xylene was the only actionable VOC detected in the surface soil in the Ester I tank farm area and in the northwest corner of Ester I complex, other actionable VOCs attributable to Grace were discovered, along with xylene, in the subsurface soils in both of these AECs. *See id.* at 1069, 1071 (benzene was found in the Ester I complex; benzene and TCE were found in the Ester I tank farm area).[3]

The Court did not separately apportion the surface and subsurface soils for AEC 4 and 9A. Therefore, given the mix of VOCs in AEC 4 (xylene and benzene) and in AEC 9A (xylene, TCE and benzene), time-of-use is the appropriate formula for apportionment of VOC contamination in the Ester I complex and Ester I tank farm areas.

### c. ZAA Complex

▇▇▇ Grace also directs the Court's attention to the ZAA complex (AEC 19), where the only actionable VOCs detected were TCA and DCA, a TCA daughter product. *Id.* at 1073. Hatco was the sole source of TCA in this area and thus was assigned full responsibility for the actionable TCA and TCA daughter products. *Id.* However, the Court subsequently apportioned the VOC contamination in the ZAA area by time-of-use. *Id.*

Having reviewed this section of the Apportionment Opinion, the Court agrees with Grace that some modification is required. A close reading reveals an error—likely typographical—which alters the Court's apportionment of VOC contamination. The Apportionment Opinion states: *"BN and PCB* allocation in the ZAA area will mirror the Ester I complex percentages ... with Grace receiving 100% of the PCBs and 57.6% of the *BNs and VOCs* and Hatco receiving 42.4% of the *BNs and VOCs." Id.* (emphasis added).

The Court inadvertently included the term "VOCs" in the foregoing sentence concerning allocation of BNs and PCBs in the ZAA area. Given the fact that no actionable VOCs attributable to Grace were detected in the ZAA area, the Court modifies this sentence by deleting the reference to VOCs.[4]

### d. Groundwater

▇▇▇ Grace asks the Court to reassess its application of a time-of-use formula to apportion groundwater contaminated with TCA daughter products, despite the fact that Hatco has been assigned full responsibility for.

---

3. Grace introduced TCE to the site in 1964 and used it to clean the hydrotherm units. Apportionment Opinion, 836 F.Supp. at 1059.

4. The sentence should now read: "BN and PCB allocation in the ZAA area will mirror the Ester I complex percentages ... with Grace receiving

100% of the PCBs and 57.6% of the BNs and Hatco receiving 42.4% of the BNs." This modification does not alter any of the other apportionment percentages for the ZAA area. *See* Apportionment Opinion, 836 F.Supp. at 1073 (100% TCA and TCA daughter products to Hatco; 100% toluene to Grace).

groundwater contaminated with TCA itself. The Court determined that time-of-use should apply to VOC-contaminated groundwater except in those instances where xylene or TCA are the only actionable VOC. Apportionment Opinion, 836 F.Supp. at 1076. For an explicit reason, the Court limited the exceptions to time-of-use apportionment of groundwater contamination. While TCA itself was attributed exclusively to Hatco, the Court was unable to make specific findings as to TCA daughter products, which may also occur through the degradation of TCE, a VOC exclusively attributable to Grace. *See, e.g.,* Apportionment Opinion, 836 F.Supp. at 1062 ("monitoring well data indicate[d] *no exclusive TCA daughter products,* but some exclusive TCE daughter products") (emphasis added). Thus, the Court could only speculate, rather than make any specific findings that actionable TCA daughter products were attributable solely to TCA degradation. Time-of-use was the appropriate formula for apportioning groundwater contamination involving TCA daughter products.

### 3. Metals

The Court held Grace jointly and severally liable to Hatco for the remediation of metal contamination at the site. Apportionment Opinion, 836 F.Supp. at 1089. Grace asserts that this holding is without any evidentiary support. The Court agrees and thus concludes that Grace cannot be held responsible for metal contamination.

■ Before Grace is required to prove a divisibility defense or that an environmental harm is capable of reasonable apportionment, Hatco is required to make a prima facie showing that Grace, as the previous owner of site, is responsible for the release. CERCLA provides that "any person who at the time of disposal of any hazardous substance owned or operated any facility" may be liable for the costs incurred to respond to that hazardous substance. 42 U.S.C. § 9607.

■ Neither party presented any significant evidence to the Court with respect to metal contamination. Grace cannot be required to prove divisibility where Hatco has failed to make even the most minimal showing that Grace is somehow responsible for the presence of any hazardous metals at the site. Therefore, the Court concludes that Hatco may not recover any costs associated with the remediation of metal contamination at the site.[5]

### 4. Well 17S

■ Finally, Grace argues that the Court should have assigned to Hatco, not to Grace, full responsibility for the PCB contamination in Well 17S. Grace likens the contamination in Well 17S to that which has been found in Well 15S, where the PCB contamination was attributed to Hatco's exclusive use of xylene. Well 17S contains significant amounts of TCA, a VOC which—like xylene—facilitates the migration of PCBs into the groundwater. The Court summarily rejects Grace's request.

While Hatco may be primarily responsible for VOC contamination in Well 17S, the Court will not consequently attribute the Well's PCB contamination to Hatco, given its location in the former ponds area (AEC 2). The Apportionment Opinion is not ambiguous: PCB-contaminated soils in the former pond area are in direct contact with the water table. *See* Apportionment Opinion, 836 F.Supp. at 1075–76.

### CONCLUSION

Having considered the parties' motions for reconsideration the Court has attempted to clarify certain aspects of the Apportionment Opinion and the related Order. However, three corrections are required. Therefore, the Court will order the following modifications. First, Paragraph Four of the Order should be deleted in its entirety and replaced with language that reads: "In areas that contain PCBs and other categories of contaminants, whether it be soil or groundwater, Grace will be able to deduct Hatco's share of

---

5. In areas containing metals and other categories of contaminants assignable to Grace, Grace will be able to deduct Hatco's costs for metals remediation only if the total cost incurred would exceed the costs allocated for the remediation of the other categories of contaminants in that area. *Cf.* Apportionment Opinion, 836 F.Supp. at 1089 n. 29.

the response costs that have or would be incurred in excess of the response cost allocated to PCB removal."

Second, the two references to "VOCs" are deleted from paragraph 218 of the Court's factual findings in the Apportionment Opinion. The only actionable VOCs detected in the ZAA area are attributable exclusively to Hatco. Third, paragraph 32 of the Court's conclusions of law in the Apportionment Opinion should be deleted in its entirety. Based upon the trial record, Hatco did not make the requisite prima facie showing to establish that Grace should be held responsible for metals contamination at the site.

An appropriate order is attached.

### ORDER

In accordance with the Court's Opinion filed herewith,

It is on this 29th day of April, 1994,

ORDERED that Paragraph Four of the Court's Order dated November 1, 1994, is amended in its entirety and should instead read: "In areas that contain PCBs and other categories of contaminants, whether it be soil or groundwater, Grace will be able to deduct Hatco's share of the response costs that have or would be incurred in excess of the response cost allocated to PCB removal." And it is further

ORDERED that the Court's Opinion, *Hatco Corp. v. W.R. Grace & Co.–Conn.*, 836 F.Supp. 1049 (D.N.J.1993), should be amended as follows: (1) the two references to "VOCs" are stricken from paragraph 218 of the Court's factual findings, and (2) paragraph 32 of the Court's conclusions of law should be stricken in its entirety.