**WHITLOCK PACKAGING CORP., Plaintiff,**

v.

**PRECISION DIVERSIFIED SYSTEMS, INC., a/k/a/ PDS, Inc., Defendant.**

**Precision Diversified Systems, Inc., a/k/a PDS, Inc., Third Party Plaintiff,**

v.

**Jerry D. Whitlock, Third Party Defendant.**

**No. CIV.A.97–3769 (HAA).**

United States District Court, D. New Jersey.

Aug. 11, 1998.

Order Denying Reconsideration; Dec. 2, 1998.

---

James R. Gregory, Gregory & Reed, P.C., Parsippany, NJ, for Plaintiff and Third Party Defendant.

Samuel N. Reiken, Law Offices of Samuel Reiken, P.C., Parsippany, NJ, for Defendant and Third Party Plaintiff.

## OPINION

CHESLER, United States Magistrate Judge.

## I. INTRODUCTION

This matter comes before the Court on the motion of Defendant, Precision Diversified Systems, Inc. ("Defendant" or "PDS"), to confirm an arbitration award and for the entry of judgment or, in the alternative, for summary judgment and dismissal of Plaintiff's complaint, and on the cross-motion of Plaintiff, Whitlock Packaging Corp. ("Plaintiff" or "Whitlock"), to confirm the arbitration award (pleaded as a cross-motion for summary judgment on liability) and for the scheduling of a trial on damages. The parties consented to having the matter resolved by the undersigned, see 28 U.S.C. § 636(c), and an Order of Reference was entered by the Honorable Harold A. Ackerman, U.S.D.J., on April 23, 1998.[1] Oral argument was heard on June 22, 1998. For the reasons set forth below, Defendant's motion to confirm the arbitration award will be denied, Defendant's alternative motion for summary judgment will be granted so far as it deals with damages, Plaintiff's cross-motion to confirm the arbitration award will be granted, and Plaintiff's cross-motion for the scheduling of a trial on damages will be denied.

## II. BACKGROUND

Plaintiff, Whitlock Packaging Corp. ("Plaintiff" or "Whitlock"), is the owner and operator of a large beverage blending and packaging plant located in Wharton, New Jersey. Defendant, Precision Diversified Systems, Inc. ("Defendant" or "PDS"), is the manufacturer of a piece of

---

1. Section 636(c) states in relevant part that [u]pon the consent of the parties, a full-time United States magistrate [judge] ... may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves. [ ] Upon entry of judgment in any case referred under ... this subsection, an aggrieved party may appeal directly to the appropriate United States court of appeals from the judgment of the magistrate [judge] in the same manner as an appeal from any other judgment of a district court. 28 U.S.C. § 636(c)(1) and (c)(3).

equipment known as beverage cooling tunnels ("Tunnel" or "Tunnels"). A Tunnel is an important link in the production line because it must quickly cool freshly filled cans containing hot beverages as the cans pass through the Tunnel on specially designed conveyor belts. *See* Alexander Dep. ¶. Once the cans are filled with hot beverages and cooled in the Tunnel, they continue down the production line where they are labeled and packaged for shipping. *Id.* at ¶ 3. Without proper cooling, the entire production line will be slowed or halted completely. *Id.* at ¶ 4.

In late 1995, Plaintiff and Defendant began discussions regarding Plaintiff's need for a Tunnel at their Wharton, New Jersey facility. *Id.* at ¶ 3. In late 1995 and early 1996, Defendant entered into two contracts with Plaintiff to manufacture two separate special pieces of equipment for Plaintiff known as airmist coolers. *See* Ware Aff. ¶ 2. Both orders were verbal but were subject to Defendant's standard purchase order terms and conditions that were submitted to Plaintiff. *See* Defendant's Statement of Undisputed Facts at ¶ 2 [hereinafter "Defendant's Statement"]. Plaintiff provided Defendant with pertinent specifications of performance that the cooling Tunnels had to meet or exceed. *See* Plaintiff's Statement of Undisputed Facts at ¶ 3 [hereinafter "Plaintiff's Statement"]. Defendant advised Plaintiff that it could design and manufacture a Tunnel that would meet or exceed the required specifications for a sixty foot Tunnel that could process forty-six ounce cans at the rate of 360 per minute. *Id.*

Defendant designed and constructed the Tunnel which was then installed at Plaintiff's facility in Wharton, New Jersey. *See* Ware Aff. at ¶ 2. Plaintiff paid for the first piece of equipment in full and left a balance of $90,000 due on the second piece of equipment. *See* Defendant's Statement at ¶ 3. After installation, the Tunnel was placed in operation and failed to perform according to the specifications because it could not cool the requisite amount of cans

per minute. *See* Plaintiff's Statement at ¶ 5. Additionally, the Tunnel was continually out of service and required substantial repairs. *Id.* Some of the machine's failures included broken tail shafts, broken sprockets on the drive shaft and tail shaft, stoppage due to motor over-current, a high level of chain wear and damage, broken bearing mount, and a cracked structural member at the drive shaft. *Id.* The down time of the Tunnel allegedly caused a halt to Plaintiff's production process on numerous occasions. *Id.*

Plaintiff concluded that the Tunnel's failure was caused by the manner in which Defendant designed and constructed the equipment. *Id.* at ¶ 6. Defendant strongly disagreed with this conclusion and claimed that Plaintiff had misused the Tunnel by allowing or causing excessive calcium build-up in the Tunnel. *Id.* at ¶ 7. In order to facilitate a resolution to the controversy, the parties agreed to allow the independent engineering company of Luciano Packaging Technologies, Inc., of Somerville, New Jersey ("Luciano"), to act as a third party inspector and to review the cause of the Tunnel's failure. *Id.* at ¶ 8. Specifically, Howard R. Leary, Vice President of Applied Engineering at Luciano ("Leary"), was to determine if the cause of the Tunnel's failures was a result of design and structural integrity and quality of materials that Defendant used or a result of increasing friction on the machine due to Plaintiff's chemically induced scale build-up by water treatment biocide chemicals. *Id.*

Plaintiff and Defendant agreed that if Leary's determination of the cause of the failures is favorable to Defendant, Plaintiff would pay an additional $30,000 towards final settlement of the second Tunnel and would reimburse Defendant for the performance bond cost. *Id.* at ¶ 9. Plaintiff's president, and the third-party defendant in this case, Jerry Whitlock, personally guaranteed the payment of $30,000 in the event Leary's decision favored Defendant. *Id.* ¶ 10.

If Luciano upheld Plaintiff's position, however, Defendant would have to perform all necessary repairs on Tunnel One (estimated to be about $15,000) and Plaintiff would not be required to make any further payments towards the purchase of Tunnel Two (*i.e.,* the $60,000 initial payment satisfied the entire purchase price for the Tunnel and Defendant would be required to bear the cost of the performance bond). *Id.* at ¶ 9. Defendant also agreed that its president, Gerald Ware, would personally go to Plaintiff's facility within ten days of Leary's report to schedule a date for the necessary repairs. *Id.* at ¶ 10. Additionally, Defendant agreed that the repairs would be completed within three days of the repair date. *Id.*

Leary issued his letter report on February 17, 1997, in which he concluded that the Tunnel "appear[ed] to be operating at its limits of strength and power" which allegedly was below the specification of running 360 forty-six ounce cans through per minute. *Id.* at ¶ 12. The report suggested reducing the load on the Tunnel by cutting down on the amount of product on the conveyor belt. *Id.* The report also suggested that "wear strips" be installed on the Tunnel in order to support the return run of the chain thereby reducing the chain's tension. *Id.* Furthermore, the report noted that scale build-up was evident for a time probably resulting in an increase in friction, but a change in the chemicals used had eliminated the build-up. *Id.* at ¶ 14. Leary noted, however, that the Tunnel's failure continued after the elimination of any scale build-up. *Id.*

After receipt of Leary's report, both parties thought the decision was in their favor and neither party executed the duties that they agreed to perform had the decision been adverse to their position. Defendant did not make any repairs to the Tunnel to allow it to operate within the specifications. *Id.* at ¶ 15. In order to continue the production of its product, Plaintiff had to make repairs and modifications to the Tunnel. *Id.* at ¶ 16. Plain-

tiff's modifications reduced the tension on the tail shaft of the Tunnel which in turn reduced the load on the Tunnel so that it would not continuously break down. *Id.* Once these modifications were completed, the Tunnel allegedly began cooling the amount of cans that Defendant initially specified that it would. *Id.*

Through their attorneys, the parties requested that Leary clarify his report so that a better determination could be made as to who was at fault. *Id.* at ¶ 18. Accordingly, Leary wrote a second letter to the parties on November 7, 1997. *Id.* Leary stated in this letter that the "beam bending" was the probable cause for the Tunnel's failures. *Id.* at ¶ 19. Leary stated, however, that he did not possess the data to properly explain how this happened, but that it had to be inherent in the design or construction of the Tunnel. *Id.* The letter did not discuss the calcium build-up claim made by Defendant and did not address whether this was the reason for the Tunnel's failure. *Id.*

Defendant's president telephoned Leary after receiving his November 7, 1997, letter. *Id.* at ¶ 20. Defendant discussed their theory of water/calcium build-up and alleged unauthorized repairs as possible causes for the Tunnel's failure. *Id.* In response to this call, Leary wrote Plaintiff's attorney a letter in which he stated that he was unable to comment on Defendant's suggested causes because they allegedly happened prior to his involvement. *Id.*

Defendant's president subsequently called Leary two more times and faxed him a letter on December 2, 1997. *Id.* at ¶ 21. Following these calls, Leary wrote another letter to Plaintiff's attorney on December 3, 1997. *Id.* Leary stated, in response to Defendant's inquiry into the calcium build-up issue, that he did not endorse that as a probable cause of the problematic beam deflection but that he could not discount it either because it is "incalculable." *Id.*

While all of the interim clarifications were sought, Plaintiff filed a complaint with this court on July 30, 1997, alleging breach of contract. Defendant answered Plaintiff's complaint, filed a counterclaim, and filed a third party complaint on September 29, 1997. The instant motions were filed subsequent to these dates.

## III. DISCUSSION

Defendant has filed this motion to confirm the arbitration award, or in the alternative for summary judgment, because it believes that Leary's letters favored Defendant and that Plaintiff is barred from bringing suit in this court due to the contractual arbitration remedy that the parties agreed to after the Tunnel's failure. Plaintiff disagrees with Defendant's contention and has filed the instant cross-motion to confirm the the arbitration award based on their belief that Leary's report was favorable to their position and that Defendant is clearly liable for the failure of the Tunnel: Each argument will be discussed in turn.

### A. Confirm Arbitration Award

■ The parties in this action clearly entered into a contract in which they agreed to be bound by the determination of the third party engineer from Luciano. Because the contract was one which evidenced a transaction involving interstate commerce,[2] the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, ("FAA") applies to the agreement.[3]

2. The Federal Arbitration Act defines "commerce" as "commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation." 9 U.S.C. § 1.

3. The New Jersey State Arbitration Act, N.J.S.A. 2A:24–1 *et seq.*, would also apply in this situation. The Act states in relevant part that

### 1. Standard

■ Under the FAA, a court must grant a motion to confirm an arbitration award unless it has grounds to vacate, modify, or correct the award. *See* 9 U.S.C. § 9 (1970). The court's function in confirming or vacating an arbitration award is severely limited. *Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters*, 969 F.2d 1436, 1441 (3d Cir.), *cert. denied*, 506 U.S. 1022, 113 S.Ct. 660, 121 L.Ed.2d 585 (1992); *Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.*, 868 F.2d 52, 56 (3d Cir.1989). Their powers of review have been described as "among the narrowest known to the law." *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995).

■ In reviewing an award, the court should not consider whether the arbitrator committed an error of law. *Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59, 62 (3d Cir.1986). The court may only consider such things as the partiality or corruption of the arbitrator, misconduct of the arbitrator, where the arbitrator has exceeded his powers, a miscalculation in the award, or an imperfection in the award. 9 U.S.C. §§ 10, 11 (1970); *Denver & Rio Grande W. R. Co. v. Union Pac. R. Co.*, 119 F.3d 847, 849 (10th Cir.1997) ("[a] court may only vacate an arbitration award for reasons enumerated in ... 9 U.S.C. § 10, or for a handful of judicially created reasons."); *see also W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766, 103

A provision in a written contract to settle by arbitration a controversy that may arise therefrom or a refusal to perform the whole or a part thereof or a written agreement to submit, pursuant to section 2A:24–2 of this title, any existing controversy to arbitration, whether the controversy arise out of contract or otherwise, shall be valid, enforceable and irrevocable, except upon such grounds as exist at law or in equity for the revocation of a contract.

N.J.S.A. 2A:24–1. Due to the subject matter of this case, the FAA supercedes the applicability of the New Jersey statute.

S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983) (awards that violate public policy may be vacated by a court); *Wilko v. Swan*, 346 U.S. 427, 436–37, 74 S.Ct. 182, 187–88, 98 L.Ed. 168 (1953) (awards that are based upon a manifest disregard of the law may be vacated), *overruled on other grounds*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *Bowles Fin. Group v. Stifel, Nicolaus & Co.*, 22 F.3d 1010, 1012–13 (10th Cir.1994) (an award may be set aside if the arbitrator failed to conduct a fundamentally fair hearing). Errors in the arbitrator's factual findings or interpretations of the law, unless there was a manifest disregard for controlling law, do not justify a court's review or reversal on the merits. *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 36–38, 108 S.Ct. 364, 369–70, 98 L.Ed.2d 286 (1987); *ARW Exploration*, 45 F.3d at 1463; *Bowles*, 22 F.3d at 1012.

### 2. Existence of an Award

■■■ The first inquiry that this Court must make is whether or not an arbitration award was issued. Because the "arbitrator" in this case was not a "traditional" arbitrator, in that he was an engineer rather than an accomplished attorney, there may be some question as to whether an "award" was actually issued and, if so, what that award was comprised of.[4] While most awards are memorialized in a written document, the FAA does not require an arbitrator's award to be in writing. *See* 9 U.S.C. § 1 *et seq.* Some states, however, require that awards be written in order to be enforceable. *See* N.J.S.A. 2A:24–7 (West 1987); Ohio Rev.Code Ann. § 2711.08 (Anderson Supp.1998). Additionally, some states require that an award be acknowledged or proved in some way and be served upon the parties in the action. *See* N.J.S.A. 2A:24–7 (West 1987).

Finally, the parties to an arbitration agreement can modify the way in which the award is issued, delivered, or even presented as long as their agreement does not conflict with the governing law.

■■■ Normally, the common law doctrine of *functus officio* applies to arbitrators who have previously issued an award. *Mercury Oil Refining Co. v. Oil Workers Int'l Union*, 187 F.2d 980, 983 (10th Cir. 1951). Under this concept, an arbitrator has no power or authority to proceed any further once a decision has been made and an award has been issued. *Id.* Although courts in more recent cases have upheld the validity of the doctrine, especially when an arbitrator is asked to reconsider or amend the merits of an initial award, they have recognized an arbitrator's power to proceed further when an ambiguity exists in the award and there is a need for clarification. *Teamsters Local 312 v. Matlack, Inc.*, 118 F.3d 985 (3d Cir.1997). Accordingly, an arbitration award that contains ambiguities should be clarified by the arbitrator himself and not by the Court. *United Steelworkers of America v. Mueller Brass Co.*, 479 F.Supp. 413 (N.D.Miss. 1979); *see also A/S Siljestad v. Hideca Trading, Inc.*, 541 F.Supp. 58 (S.D.N.Y. 1981), *aff'd*, 678 F.2d 391 (2d Cir.1982); *Puerto Rico Maritime Shipping Auth. v. Star Lines Ltd.*, 454 F.Supp. 368, 372 (S.D.N.Y.1978).

After reviewing the submissions of the parties and considering their comments at oral argument, the Court concludes that there was in fact an award issued by Leary. That award comprised of Leary's report dated February 17, 1997, and his subsequent summaries and restatements, requested and approved by the parties, issued by letter on November 7, 1997, and December 3, 1997. The three writings

---

**4.** An arbitrator need not be an attorney in order to be qualified. An arbitrator merely has to be fair and impartial so as to render faithful, honest, and disinterested opinions. *Kentucky River Mills v. Jackson*, 206 F.2d 111 (6th Cir.), *cert. denied*, 346 U.S. 887, 74 S.Ct.

144, 98 L.Ed. 392 (1953). The parties have made no allegations that the arbitrator was anything but fair and impartial in making his decision. Accordingly, the Court will deem the arbitrator to have been qualified.

sent by Leary, therefore, constitute a definite and unambiguous arbitration award.

### 3. Confirmation of the Award

■ Because an award existed, I must now determine whether to confirm the award or whether to vacate, modify, or correct the award as permitted by the FAA. There is clearly no reason for this Court to vacate, modify, or correct the award. The parties have made no allegations that the arbitrator was anything but impartial and moral, or that he abused or exceeded his powers. Additionally, there have been no allegations of a miscalculation or imperfection in the award. Accordingly, this Court is required to confirm the arbitrator's award.[5] The question to answer then is who did the arbitrator's award favor?

It is clear to the Court after reviewing the submissions of the parties and hearing counsel's comments at oral argument that Leary's award favored Plaintiff. While Leary's initial report dated February 17, 1997, is fairly technical in its analysis, it is clear in its conclusions that the causes for the specific failures of the Tunnel were defects in either its design or manufacture.[6]

Leary then discussed each different problem that the Plaintiff experienced with the Tunnel. First, Leary addressed the problems dealing with the beam bending. Leary stated that the beams were deflecting approximately one inch downward at the center and that this was causing an increase in tension on the return chain run and unwanted troughing of the conveyor chain. *See* Leary Feb. 17, 1997, Letter at 2. Based upon the calculations that he

made, Leary concluded that the weight of the chain and the product could only have caused about one third of the bending. *Id.* Instead, the majority, if not all, of the bending occurred by the flexing of the sidewalls or some other warping effect. *See* Leary Nov. 7, 1997, Letter at 2.

Next, Leary addressed the problems with the broken tail shafts. He first stated that this feature presented a stress concentration that made the point of the fracture weaker than the nearby bearing journals. *See* Leary Feb. 17, 1997, Letter at 3. Leary concluded from this that the failure was in the bending and that it was caused by fatigue. *Id.* Leary stated that the relatively smooth surfaces originating at the four corners showed the area of gradual, small cracks that occurred over time as the shaft rotated, repeatedly applying stress to the corners. *Id.* "The jagged central portion of the fracture showed where the weakened shaft let go." *Id.* According to Leary, the cause of the shaft breakage was an abnormal amount of chain tension on the return conveyor. *Id.*

Third, Leary discussed the chain wear and damage which the Tunnel suffered. *Id.* at 4. The report stated that the chain installed on the Tunnel had a working load capability of 7800 pounds, a number that approximated the size of an actual load. *Id.* He continued by stating that any misalignment of the drive and/or the tail shaft could cause local increases in the tension of the chain, thereby damaging it and other parts of the Tunnel. *Id.* Leary concluded that the tension in the chain was higher than it should be and that the excessive tension applied the forces that caused the

---

**5.** Defendant argues that this Court does not have jurisdiction under the FAA to hear Plaintiff's cross-motion for summary judgment. Defendant argues that because Plaintiff's cross-motion seeks summary judgment on the claims in the complaint and does not mention the arbitration award, this Court cannot confirm the arbitration award in Plaintiff's favor. After reading Plaintiff's papers and hearing

counsel for both parties at oral argument, it is clear to this Court that Plaintiff's cross-motion is actually a cross-motion to confirm the arbitration award. Accordingly, the Court will treat the cross-motion as such.

**6.** The report begins by discussing the load calculations needed to evaluate the equipment. For the complete set of specific calculations, see Ware Aff. at Ex. F., pp. 1–2.

damage to the Tunnel. *See* Leary Nov. 7, 1997, Letter at 1.

Next, Leary talked about the catenary sag in the return run chain. *Id.* Leary's letter stated that everything about the design of the Tunnel was correctly sized based on the conventional load calculations, which had taken into consideration the speed, the product weight, the size of the conveyor, and the type of chain. *Id.* Nevertheless, Leary noticed signs of greater tension on the return run chain. *Id.* He estimated that the tension was as much as 4000 pounds higher than the normal. *Id.* This much additional force was enough to cause the bending fatigue failure of the tail shaft and the higher chain pull was enough to require greater horsepower output than the drive capability. *Id.*

In Leary's opinion, the excess tension was caused by the beams that support the carrying run of the chain which had been bent so much as to press against the return run of the chain. *Id.* at 2. Leary concluded that this problem was the cause of the tension because the bowing could not have been induced by the weight carried by the beam, as his calculations demonstrated that the beam was too strong for that, and no other causative factor was apparent. *Id.* The actual bending of the beam was not apparent because Leary only witnessed the machine while it was in operation, but it could have been caused by flexing of the sidewalls or some other warping effect. *Id.*

Finally, Leary discussed the probability that the Tunnel's failures were the result of the calcium build-up. *See* Leary Dec. 3, 1997, Letter at 1. Defendant contends that an additional source of loading on the beams that became bowed was the irregular amount of calcium that was building up on the machine. *Id.* Leary stated that there was no way to calculate the additional vertical force that this build-up could apply and that intuitively, it would be extremely small. *Id.* Although he could not discount this as a factor because it was incalculable, Leary would not endorse this theory as a probable cause of the beam deflection. *Id.*

There is no doubt that the conclusions which Leary made in his award favored Plaintiff on the issue of liability. All of his discussions regarding the tail shaft, the bent beams, and the problems with the chain and the return run of the chain center around the design of the unit and how it performed when product was actually put through the system. Leary concluded that all of these problems were caused by defects in the Tunnel itself, not in the use of the machine. Additionally, Defendant's theory that the problems were caused by an excess calcium build-up was discounted by Leary as a probable cause of the damage. Accordingly, Plaintiff's cross-motion to confirm the arbitration award in their favor will be granted.

## B. Damages

Plaintiff's cross-motion also seeks an order setting this matter down for a trial on damages. Because the agreement to arbitrate covered only liability, Plaintiff seeks this avenue to recover money damages from Defendant. Defendant's alternative motion for summary judgment, however, seeks dismissal of Plaintiff's complaint based on the remedy contracted for in the arbitration agreement. Defendant argues that because the parties each agreed to a remedy if the arbitrator's decision went against their interest, Plaintiff must adhere to that contract and accept only the previously agreed upon cure.

As previously stated, Plaintiff and Defendant agreed that if Leary's determination of the cause of the failures is favorable to Defendant, Plaintiff would pay an additional $30,000 towards final settlement of the second Tunnel and would reimburse Defendant for the performance bond cost. *See* Plaintiff's Statement at ¶ 9. Plaintiff's president, and the third-party defendant in this case, Jerry Whitlock, personally guaranteed the payment of $30,000 in the event

Leary's decision favored Defendant. *Id.* ¶ 10.

If Leary upheld Plaintiff's position, however, Defendant would have to perform all necessary repairs on Tunnel One (estimated to be about $15,000) and Plaintiff would not be required to make any further payments towards to purchase of Tunnel Two (*i.e.,* the $60,000 initial payment satisfied the entire purchase price for the Tunnel and Defendant would be required to bear the cost of the performance bond). *Id.* at ¶ 9. Defendant also agreed that its president, Gerald Ware, would personally go to Plaintiff's facility within ten days of Leary's report to schedule a date for the necessary repairs. *Id.* at ¶ 10. Additionally, Defendant agreed that the repairs would be completed within three days of the scheduled repair date. *Id.*

This Court has already determined that Leary's decision favored Plaintiff as far as liability for the Tunnel's failures are concerned. Therefore, it must be ascertained whether the agreement entered into between the parties regarding the remedies available is exclusive. If it is exclusive, then Plaintiff is left with that remedy alone even though they prevailed in the arbitration. If it is not exclusive, then Plaintiff may have the opportunity to seek additional damages, including reimbursement for the repairs they had performed by those other than Defendant.

 It is clear to this Court that Plaintiff is not entitled to any damages other than those called for in the agreement with Defendant. Plaintiff and Defendant agreed to certain and specific terms regarding repair and damages once the arbitrator had made a decision on liability. The question on damages was not one that was even submitted to the arbitrator for a decision. The parties individually agreed to certain remedies if they were found liable for the Tunnel's failures.

Even though Plaintiff agreed to the specific remedies, they knowingly and voluntarily had repairs made on the Tunnel prior to the issuance of the arbitration award. Through this litigation, Plaintiff is now seeking to be reimbursed for the costs of these repairs. A plain reading of the arbitration agreement and the contract regarding the remedy, however, shows that the exclusive remedy for Defendant being liable for the Tunnel's failures is that Defendant would perform the repairs.

It is obvious that Plaintiff's cost to repair the Tunnel would be different from, and more expensive than, that of Defendant because Defendant is the manufacturer of the equipment whose employees possess the required expertise in maintaining and repairing this machine. The bargained for exchange between the parties was for Defendant to make all repairs if the arbitration award was in Plaintiff's favor. It was not that Defendant was responsible for Plaintiff's cost of repair.

Plaintiff foreclosed their option of having Defendant bear the cost of the repairs when they had the Tunnel repaired by a third party. Plaintiff should have held off on the repairs until such time that arbitrator made his decision and issued the award. At that time, Plaintiff could have moved to compel enforcement of the contract if Defendant refused to abide by the agreement. Instead, Plaintiff fixed the broken equipment. By doing so, however, Plaintiff went against the terms of the agreement which they were bound by. Plaintiff now asks this Court to re-write the agreement and allow a trial on damages. The Court is unable and unwilling to grant Plaintiff's request.[7] Accordingly,

---

**7.** Courts generally do not alter or modify terms in a contract unless the agreement is unconscionable, illegal, vague, or unenforceable in some other way. *See Saul v. Midlantic Nat'l Bank,* 240 N.J.Super. 62, 78, 572 A.2d 650, 658 (App.Div.) (the general principles of contract law state that the parties are free to adopt any reasonable terms, not otherwise contrary to public policy, upon which they can agree and that such agreements will be enforced by the courts), *certif. denied,* 122 N.J. 319, 585 A.2d 338 (1990); *City Council of Elizabeth v. Fumero,* 143 N.J.Super. 275, 284, 362 A.2d 1279 (Law Div.1976) (same); *Bever-*

Plaintiff's cross-motion for a trial on damages will be denied and Defendant's alternative motion for summary judgment will be granted so far as it deals with the issue of damages.

## IV. CONCLUSION

For the reasons set forth above, Defendant's motion to confirm the arbitration award will be denied. Furthermore, Defendant's alternative motion for summary judgment will be granted so far as it deals with the issue of damages. Additionally, Plaintiff's cross-motion to confirm the arbitration award (pleaded as a cross-motion for summary judgment) will be granted in part and denied in part. Finally, Plaintiff's cross-motion for a trial on damages will be denied. An appropriate order will issue.

## ORDER

This matter comes before the Court on the motion of Defendant, Precision Diversified Systems, Inc. ("Defendant" or "PDS"), to confirm an arbitration award and for the entry of judgment or, in the alternative, for summary judgment and dismissal of Plaintiff's complaint, and on the cross-motion of Plaintiff, Whitlock Packaging Corp. ("Plaintiff" or "Whitlock"), to confirm the arbitration award (pleaded as a cross-motion for summary judgment on liability) and for the scheduling of a trial on damages. The parties consented to having the matter resolved by the undersigned, *see* 28 U.S.C. § 636(c), and an Order of Reference was entered by the Honorable Harold A. Ackerman, U.S.D.J., on April 23, 1998. Oral argument was heard on June 22, 1998; and consistent with this Court's opinion of even date;

IT IS, therefore, on this **11th** day of August, 1998, hereby

**ORDERED** that Defendant's motion to confirm the arbitration award be and hereby is **DENIED;** and it is further

**ORDERED** that Defendant's alternative motion for summary judgment be and hereby is **GRANTED** to the extent that Defendant is not required to reimburse Plaintiff for repair costs incurred in fixing the first airmist cooler; and it is further

**ORDERED** that Plaintiff's cross-motion to confirm the arbitration award (pleaded as a cross-motion for summary judgment on liability) be and hereby is **GRANTED** to the extent that Plaintiff is not required to make any further payments for the second airmist cooler; and it is further

**ORDERED** that Plaintiff's cross-motion to confirm the arbitration award (pleaded as a cross-motion for summary judgment on liability) be and hereby is **GRANTED** to the extent that Defendant is required to bear the cost of the performance bond; and it is further

**ORDERED** that Plaintiff's cross-motion for a trial on damages be and hereby is denied; and it is further

**ORDERED** that Plaintiff's Complaint be and hereby is **DISMISSED** with prejudice.

## OPINION

### I. INTRODUCTION

This matter comes before the Court on the motion of Plaintiff, Whitlock Packaging Corp. ("Plaintiff" or "Whitlock"), for reconsideration of this Court's decision denying its cross-motion for a trial on damages. The parties consented to having the mat-

ly *Sewerage Auth. v. Delanco Sewerage Auth.,* 65 N.J.Super. 86, 98, 167 A.2d 46, 52 (1961) (a contractual relationship between the parties that does violate public policy must be respected), *aff'd,* 70 N.J.Super. 575, 176 A.2d 276 (App.Div.1961), *aff'd,* 38 N.J. 354, 184 A.2d 864 (1962); *Terminal Const. Corp. v. Bergen County,* 34 N.J.Super. 478, 504, 112 A.2d 762 (App.Div.1954), *modified on other grounds,* 18 N.J. 294, 113 A.2d 787 (1955) (the general principles of contract law state that the parties are free to adopt any reasonable terms, not otherwise contrary to public policy, upon which they can agree and that such agreements will be enforced by the courts).

ter resolved by the undersigned, *see* 28 U.S.C. § 636(c), and an Order of Reference was entered by the Honorable Harold A. Ackerman, U.S.D.J., on April 23, 1998.[1] No oral argument was heard pursuant to Fed.R.Civ.P. 78. For the reasons set forth below, Plaintiff's motion for reconsideration will be denied.

## II. BACKGROUND

Plaintiff, Whitlock Packaging Corp. ("Plaintiff" or "Whitlock"), is the owner and operator of a large beverage blending and packaging plant located in Wharton, New Jersey. Defendant, Precision Diversified Systems, Inc. ("Defendant" or "PDS"), is the manufacturer of a piece of equipment known as beverage cooling tunnels ("Tunnel" or "Tunnels"). A Tunnel is an important link in the production line because it must quickly cool freshly filled cans containing hot beverages as the cans pass through the Tunnel on specially designed conveyor belts. *See* Alexander Dep. ¶. Once the cans are filled with hot beverages and cooled in the Tunnel, they continue down the production line where they are labeled and packaged for shipping. *Id.* at ¶ 3. Without proper cooling, the entire production line will be slowed or halted completely. *Id.* at ¶ 4.

In late 1995, Plaintiff and Defendant began discussions regarding Plaintiff's need for a Tunnel at their Wharton, New Jersey facility. *Id.* at ¶ 3. In late 1995 and early 1996, Defendant entered into two contracts with Plaintiff to manufacture two separate special pieces of equipment for Plaintiff known as airmist coolers. *See* Ware Aff. ¶ 2. Both orders were verbal but were subject to Defendant's standard purchase order terms and conditions that were submitted to Plaintiff. *See* Defen-

dant's Statement of Undisputed Facts at ¶ 2 [hereinafter "Defendant's Statement"]. Plaintiff provided Defendant with pertinent specifications of performance that the cooling Tunnels had to meet or exceed. *See* Plaintiff's Statement of Undisputed Facts at ¶ 3 [hereinafter "Plaintiff's Statement"]. Defendant advised Plaintiff that it could design and manufacture a Tunnel that would meet or exceed the required specifications for a sixty foot Tunnel that could process forty-six ounce cans at the rate of 360 per minute. *Id.*

Defendant designed and constructed the Tunnel which was then installed at Plaintiff's facility in Wharton, New Jersey. *See* Ware Aff. at ¶ 2. Plaintiff paid for the first piece of equipment in full and left a balance of $90,000 due on the second piece of equipment. *See* Defendant's Statement at ¶ 3. After installation, the Tunnel was placed in operation and failed to perform according to the specifications because it could not cool the requisite amount of cans per minute. *See* Plaintiff's Statement at ¶ 5. Additionally, the Tunnel was continually out of service and required substantial repairs. *Id.* Some of the machine's failures included broken tail shafts, broken sprockets on the drive shaft and tail shaft, stoppage due to motor over-current, a high level of chain wear and damage, broken bearing mount, and a cracked structural member at the drive shaft. *Id.* The down time of the Tunnel allegedly caused a halt to Plaintiff's production process on numerous occasions. *Id.*

Plaintiff concluded that the Tunnel's failure was caused by the manner in which Defendant designed and constructed the equipment. *Id.* at ¶ 6. Defendant strongly disagreed with this conclusion and claimed that Plaintiff had misused the Tunnel by

---

1. Section 636(c) states in relevant part that [u]pon the consent of the parties, a full-time United States magistrate [judge] … may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves. [ ] Upon

entry of judgment in any case referred under … this subsection, an aggrieved party may appeal directly to the appropriate United States court of appeals from the judgment of the magistrate [judge] in the same manner as an appeal from any other judgment of a district court.

28 U.S.C. § 636(c)(1) and (c)(3).

allowing or causing excessive calcium build-up in the Tunnel. *Id.* at ¶ 7. In order to facilitate a resolution to the controversy, the parties agreed to allow the independent engineering company of Luciano Packaging Technologies, Inc., of Somerville, New Jersey ("Luciano"), to act as a third party inspector and to review the cause of the Tunnel's failure. *Id.* at ¶ 8. Specifically, Howard R. Leary, Vice President of Applied Engineering at Luciano ("Leary"), was to determine if the cause of the Tunnel's failures was a result of design and structural integrity and quality of materials that Defendant used or a result of increasing friction on the machine due to Plaintiff's chemically induced scale build-up by water treatment biocide chemicals. *Id.*

Plaintiff and Defendant agreed that if Leary's determination of the cause of the failures is favorable to Defendant, Plaintiff would pay an additional $30,000 towards final settlement of the second Tunnel and would reimburse Defendant for the performance bond cost. *Id.* at ¶ 9. Plaintiff's president, and the third-party defendant in this case, Jerry Whitlock, personally guaranteed the payment of $30,000 in the event Leary's decision favored Defendant. *Id.* ¶ 10.

If Luciano upheld Plaintiff's position, however, Defendant would have to perform all necessary repairs on Tunnel One (estimated to be about $15,000) and Plaintiff would not be required to make any further payments towards the purchase of Tunnel Two (*i.e.,* the $60,000 initial payment satisfied the entire purchase price for the Tunnel and Defendant would be required to bear the cost of the performance bond). *Id.* at ¶ 9. Defendant also agreed that its president, Gerald Ware, would personally go to Plaintiff's facility within ten days of Leary's report to schedule a date for the necessary repairs. *Id.* at ¶ 10. Additionally, Defendant agreed that the repairs would be completed within three days of the repair date. *Id.*

Leary issued his letter report on February 17, 1997, in which he concluded that the Tunnel "appear[ed] to be operating at its limits of strength and power" which allegedly was below the specification of running 360 forty-six ounce cans through per minute. *Id.* at ¶ 12. The report suggested reducing the load on the Tunnel by cutting down on the amount of product on the conveyor belt. *Id.* The report also suggested that "wear strips" be installed on the Tunnel in order to support the return run of the chain thereby reducing the chain's tension. *Id.* Furthermore, the report noted that scale build-up was evident for a time probably resulting in an increase in friction, but a change in the chemicals used had eliminated the build-up. *Id.* at ¶ 14. Leary noted, however, that the Tunnel's failure continued after the elimination of any scale build-up. *Id.*

After receipt of Leary's report, both parties thought the decision was in their favor and neither party executed the duties that they agreed to perform had the decision been adverse to their position. Defendant did not make any repairs to the Tunnel to allow it to operate within the specifications. *Id.* at ¶ 15. In order to continue the production of its product, Plaintiff had to make repairs and modifications to the Tunnel. *Id.* at ¶ 16. Plaintiff's modifications reduced the tension on the tail shaft of the Tunnel which in turn reduced the load on the Tunnel so that it would not continuously break down. *Id.* Once these modifications were completed, the Tunnel allegedly began cooling the amount of cans that Defendant initially specified that it would. *Id.*

Through their attorneys, the parties requested that Leary clarify his report so that a better determination could be made as to who was at fault. *Id.* at ¶ 18. Accordingly, Leary wrote a second letter to the parties on November 7, 1997. *Id.* Leary stated in this letter that the "beam bending" was the probable cause for the Tunnel's failures. *Id.* at ¶ 19. Leary stated, however, that he did not possess the

data to properly explain how this happened, but that it had to be inherent in the design or construction of the Tunnel. *Id.* The letter did not discuss the calcium build-up claim made by Defendant and did not address whether this was the reason for the Tunnel's failure. *Id.*

Defendant's president telephoned Leary after receiving his November 7, 1997, letter. *Id.* at ¶ 20. Defendant discussed their theory of water/calcium build-up and alleged unauthorized repairs as possible causes for the Tunnel's failure. *Id.* In response to this call, Leary wrote Plaintiff's attorney a letter in which he stated that he was unable to comment on Defendant's suggested causes because they allegedly happened prior to his involvement. *Id.*

Defendant's president subsequently called Leary two more times and faxed him a letter on December 2, 1997. *Id.* at ¶ 21. Following these calls, Leary wrote another letter to Plaintiff's attorney on December 3, 1997. *Id.* Leary stated, in response to Defendant's inquiry into the calcium build-up issue, that he did not endorse that as a probable cause of the problematic beam deflection but that he could not discount it either because it is "incalculable." *Id.*

While all of the interim clarifications were sought, Plaintiff filed a complaint with this court on July 30, 1997, alleging breach of contract. Defendant answered Plaintiff's complaint, filed a counterclaim, and filed a third party complaint on September 29, 1997. On that same date, Defendant also filed a notice of motion to confirm the arbitration award and for entry of judgment or, in the alternative, for summary judgment. On April 27, 1998, Plaintiff filed its cross-motion for summary judgment and a cross-motion for the scheduling of a trial on damages. This Court heard oral argument on these motions on June 22, 1998, and requested that the parties submit further briefing on whether an arbitration award had been issued.

Subsequent to the receipt of those briefs, the Court issued an opinion and order denying Defendant's motion to confirm the arbitration award, granting Defendant's alternative motion for summary judgment so far as it dealt with damages, granting Plaintiff's cross-motion to confirm the arbitration award, and denying Plaintiff's cross-motion for the scheduling of a trial on damages. Plaintiff has filed the instant motion for reconsideration of the Court's decision granting a portion of Defendant's alternative motion for summary judgment and denying its cross-motion for a trial on damages.

### III. DISCUSSION

Plaintiff has initiated this motion for reconsideration based on the argument that the Court erred when it concluded that they were precluded from obtaining any damages outside of those it had contracted for through the arbitration agreement.

### A. Standard for Reconsideration

■ A motion for reconsideration will only succeed where dispositive factual matters or controlling decisions of law were presented to the Court but not considered. *Pittston Co. v. Sedgwick James of N.Y., Inc.*, 971 F.Supp. 915, 918, 919 (D.N.J.1997); *Damiano v. Sony Music Entertainment, Inc.*, 975 F.Supp. 623, 633, 634 (D.N.J.1996); *Hatco Corp. v. W.R. Grace & Co.*, 849 F.Supp. 987, 990 (D.N.J. 1994) (*citing Pelham v. United States*, 661 F.Supp. 1063, 1065 (D.N.J.1987)). The purpose of the motion is to correct manifest errors of law or fact or to present newly discovered evidence. *In re Sharps Run Assocs., L.P.*, 157 B.R. 766, 785 (D.N.J.1993).

Local Civil Rule 7.1(g), which governs this issue, limits the motion to facts and law "overlooked" in the original motion. *United States v. Jones*, 158 F.R.D. 309, 314 (D.N.J.1994). The only proper ground for granting such a motion is that the

matters or decisions overlooked, if considered by the court, might reasonably have altered the result reached. *Starr v. JCI Data Processing, Inc.,* 767 F.Supp. 633, 635 (D.N.J.1991); *Maldonado v. Lucca,* 636 F.Supp. 621, 630 (D.N.J.1986).

The standard of review for a motion for reargument is high and relief is granted very sparingly. *NL Industries, Inc. v. Commercial Union Ins. Co.,* 935 F.Supp. 513, 516 (D.N.J.1996); *Hatco,* 849 F.Supp. at 990; *accord Jones,* 158 F.R.D. at 314; *Bakari v. Beyer,* 870 F.Supp. 85, 88 (D.N.J.1994), *rev'd on other grounds,* 82 F.3d 404 (3d Cir.1996); *Maldonado,* 636 F.Supp. at 630.

A party must show more than a disagreement with the court's decision. *Hatco,* 849 F.Supp. at 990 (*citing Panna v. Firstrust Sav. Bank,* 760 F.Supp. 432, 435 (D.N.J.1991)). A mere recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden. *Id.* (*citing Carteret Sav. Bank, F.A. v. Shushan,* 721 F.Supp. 705, 709 (D.N.J. 1989)).

### B. Plaintiff's Motion for Reconsideration

Plaintiff moves for reconsideration of the August 10, 1998, decision of this Court based on the argument that the the decision was founded upon on an incorrect factual finding that Whitlock breached the settlement agreement by repairing the tunnel before the arbitration award was issued. While it is possible that this Court's opinion could be misconstrued in that manner, it is clear that even had this been the case, the outcome of the cross-motions would not have changed and there was no error by this Court.

The parties in this action, when they agreed to arbitrate their claims, also agreed on specific remedies if they were found to be liable. These specified damages were contracted for and were the sole remedy of each party. When the arbitra-

tion award was issued and Plaintiff chose to move forward and repair the Tunnel instead of seeking to compel Defendant to do so, Plaintiff foreclosed its opportunity of receiving payment for the repairs. The agreement specifically stated that Plaintiff's sole remedy was to have Defendant repair the Tunnel. When Plaintiff had a third party repair the Tunnel instead of seeking to compel Defendant to do so, they foreclosed Defendant's ability to make repairs if Defendant did not prevail in this suit. While Defendant was clearly liable and should have made the repairs, when this Court ruled on the arbitration award the Tunnel had already been serviced. As stated in the previous opinion, this Court is unwilling and unable to grant Plaintiff's request to rewrite this contract and to allow a trial on damages. Because Plaintiff's motion is nothing more than a disagreement with this Court's decision, it's motion for reconsideration must be denied. *Hatco,* 849 F.Supp. at 990.

### IV. CONCLUSION

For the reasons set forth above, Plaintiff's motion for reconsideration will be denied.